Francis HOGAN and Daniel
Masucci, Plaintiffs,

v.

DC COMICS, Warner Communications,
Inc., Time Warner Entertainment Co.,
L.P., Nancy Collins, and Paul Lee, De-
fendants.

No. 98 Civ. 1164(SAS).

United States District Court,
S.D. New York.

Jan. 26, 1999.

George F. Carpinello, Philip J. Iovieno, Barrett Gravante Carpinello & Stern LLP, Albany, New York, for Plaintiffs.

Carol F. Simkin, Patrick T. Perkins, Fross Zelnick Lehrman & Zissu, P.C., New York, New York, for Defendants.

### *OPINION AND ORDER*

SCHEINDLIN, District Judge.

Plaintiffs Francis Hogan ("Hogan") and Daniel Masucci bring this action against defendants DC Comics, Warner Communications, Inc., Time Warner Entertainment Co., L.P., Nancy Collins ("Collins") and Paul Lee ("Lee") claiming that defendants infringed plaintiffs' copyright in an unpublished comic book entitled *Matchsticks* through defendants' painted graphic novel *Dhampire: Stillborn.* Plaintiffs also claim

that defendants misappropriated their idea for a comic book centered around the struggles of a half-human, half-vampire character. Presently before this Court is defendants' motion to dismiss pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I. Summary Judgment Standard

A motion for summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). Once this burden has been met, the non-moving party must come forward with evidence that is more than "mere speculation and conjecture," *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990), but "would be sufficient to support a jury verdict in its favor." *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (1995).

In determining whether summary judgment should be granted, the court resolves all ambiguities and draws all reasonable inferences against the moving party. *See D'Amico v. City of New York*, 132 F.3d 145, 148 (2d Cir.1998), *cert. denied*, ── U.S. ──, 118 S.Ct. 2075, 141 L.Ed.2d 151 (1998). The moving party, however, is not required to affirmatively disprove unsupported assertions made by the non-movant, *see Celotex*, 477 U.S. at 323, 106 S.Ct. 2548, and if the evidence presented by the non-movant is "merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105 (2d Cir.1998) (quoting *Liberty Lobby*, 477 U.S. at 249–250, 106 S.Ct. 2505). The court must also examine "the substantive law applicable to the underlying litigation since that law dictates which facts are material." *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572 (2d Cir.1993) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

## II. Background

This litigation arises out of two works each centered around a half-human, half-vampire character named Nicholas Gaunt. In defense of plaintiffs' copyright claim, defendants assert that plaintiffs' and defendants' works are not substantially similar in their copyrightable aspects as a matter of law. Because "a determination of substantial similarity requires a detailed examination of the works themselves," *Williams v. Crichton*, 84 F.3d 581, 583 (2d Cir.1996), I have examined both works. A description of the plaintiffs' work—a comic book—and defendants' work—a "painted novel," which resembles a glossy upscale comic book—follow.

### A. The Works

#### 1. *Matchsticks*

Plaintiffs' work, *Matchsticks*, consists of three episodes of a dark, Gothic, violent comic book monthly series that revolves around a half-vampire, half-human character named Nicholas Gaunt. According to plaintiffs, the work depicts Gaunt's struggle to discover the truth about his past, particularly to uncover the identity of his father, and his internal conflict between the forces of good and evil that arise out of his dual nature.

Gaunt's struggle is not revealed through dialogue or internal monologue so much as through occasional flashbacks and violent confrontations that he experiences with other vampires. The work also features three rival groups of vampire or monster characters: a group patterned after the Catholic Church (the "Inquisition Group"), the "Thuggies," and a group of vampires

or monsters led by a vampire named Fenris. The action in the work jumps quickly among Gaunt and these three groups, with each having their own story line. At times, it is difficult to follow the action, as different characters are introduced without explanation and the work switches from one story to the next. According to plaintiff, this effect was intentional; he wanted to "hint at" but not completely reveal the story. *See* Deposition of Francis Hogan ("Hogan Dep."), Exhibit A to Declaration of Philip J. Iovieno, plaintiffs' counsel ("Iovieno Decl."), at 73.

The work is set in the future, in the year 2017. *Matchsticks* begins with an image of Maxwell Niphe, the leader of the Thuggies and an imposing character with long white hair, dark eyes and long black robes who has been around for thousands of years, and who cryptically states the "the game is about to start" but that "one piece is not yet on board." The work then switches to Hong Kong, where Gaunt has just completed training in the martial arts. As a box of text states that "something is very very wrong," Gaunt receives a letter stating that "the wolf will devour the son." The letter also encloses a key to a room at the No–Tell Motel in Los Angeles; the key has been drawn over the "u" in sun, obscuring whether the word is "sun" or "son." The next few images are of a character named Ma Fat, who informs another character named Maggie Darden over the telephone that Gaunt is "on his way."

The comic book then skips to the Los Angeles Airport, where a female vampire named Kat, who is later revealed to be allied with Fenris, waits for Gaunt. Kat, armed with supernatural ability, travels to the No–Tell Motel with the intention of fulfilling her command to slaughter Gaunt, while on the way briefly stopping to kill her taxi driver in a gruesome, violent manner. Gaunt, able to anticipate Kat's moves because of his own supernatural senses, kills her before she is able to complete her mission. Before she dies, Gaunt asks Kat who sent her; she responds "don't . . . you

. . . know" and looks into his eyes, which are shown in extreme close-up.

Gaunt then experiences a flashback to the day from his childhood on which his mother and uncle were killed and he was found by a detective named Stanz, who took him in and raised him. Gaunt flashes back to a room in which blood is pooled on the floor and splattered on the walls, and in which someone has written, also apparently in blood, that "the wolf will devour the sun." Again, it is not clear whether "sun" has been spelled with a "u" or an "o." Gaunt is then shown leaving Los Angeles.

The work next shifts to a few frames of characters who are members of the Inquisition Group and inhabit St. Patrick's Cathedral in New York City. The group is led by a character wearing a cardinal's hat (the "Cardinal"), who is assisted by Inquisitor Hargroves, an angular, boney character with a tattoo of a question mark on his forehead. Hargroves informs the Cardinal that they have intercepted messages from the Thuggies.

Next, Gaunt is shown returning to his hometown of Albany, New York. The "Asgard Estate," home of Fenris and his vampires, is also in Albany. Fenris is then visited by a character named Zodiac, who sports sunglasses, a leather jacket and what appear to be dreadlocks. Fenris, told by Zodiac that he is delivering bad news, punches Zodiac and grabs him by the neck, at which point Zodiac reveals that Kat has been killed. Fenris expresses no remorse upon hearing this news and informs Zodiac that he had intended to kill her and Zodiac.

*Matchsticks* then moves back to the Inquisition Group and a character named Brother Flux, who appears to have technological apparatus incorporated into his body and is attempting to enter cyberspace. The story then focuses on Maxwell Niphe, the leader of the Thuggie vampire group. Niphe states that he is "Sudeah of my people: judge, jury, and executioner.

I carry out my duty in a society of monsters, vampires, werewolves, ghouls, call them what you like." Niphe instructs Maggie, a female Thuggie who was once human, to go to Albany because a "hunter" is going there.

The story returns to Albany, where Gaunt reunites with Stanz. It then moves back to St. Patrick's Cathedral, where the Cardinal, after being informed by Hargroves that he has received a report of Thuggie activity in the Albany area, decides to send a Swiss Guard platoon into the region. These members of the platoon, led by Joan Ark, wear high-tech armor, giving them a robotic appearance, and appear to have returned from a mission in Bosnia. In the background, a scantily clad female character wearing a nun's habit with the word "mercy" inscribed on the front is shown engaging in some form of ritualistic torture on an altar boy.

Meanwhile, back in Albany, Gaunt and Stanz visit a local bar. A character with a cross inscribed on the back of his head, who appears to be Zodiac, attempts to kill Gaunt but is shot by Stanz, who tells Gaunt to escape to Stanz's house in the country. On his way to the house, Gaunt is again attacked by Zodiac. Stanz again appears and shoots Zodiac before he kills Gaunt. Gaunt is then shown standing over what may be a severed head with a sword in his hand, and a box of text states that "[n]ow he is one of us." According to plaintiffs, Gaunt has just taken a step toward becoming a full-fledged vampire.

As a police car pulls up to Stanz and Gaunt, Stanz tells Gaunt that he'll take care of the situation and orders him to leave. Shortly thereafter, Stanz is captured and killed by police officers, who are really disguised agents of the Inquisition Group.

Meanwhile, Fenris is informed that Zodiac was killed when he "engage[d] Gaunt in a public display of fighting." He is also told that Maggie of the Thuggies seeks an audience with him. Fenris orders his monsters Sharkey and Angel to bring Gaunt to him.

Next, Gaunt is shown driving up to Stanz's house, the place where he was raised after the murder of his mother and uncle and to which he had not returned in ten years. Gaunt experiences a memory or a flashback to when he was a child in Stanz's house, raised with a young girl, perhaps a sister, called Elise. Gaunt then discovers Stanz's severed head in a paper bag, which had been placed on a table in the house. Gaunt, experiencing remorse over having caused Stanz's death, is then set upon by members of the Inquisition Group, though Gaunt successfully manages to escape.

Meanwhile, as Maggie Darden waits in Fenris' cellar, a watch that is pinned to her chest starts to ring, an event which inexplicably causes her to call Maxwell Niphe. Upon learning that the watch had been activated, Niphe informs Maggie that he is coming to Albany personally.

The story then returns to Gaunt, who is resting in an Albany motel. Gaunt is awakened by a telephone caller, who instructs him that "if you seek the wolf, come to Quail and Clinton." Gaunt goes to that location, where he is captured and sedated by Angel and Sharkey. They bring Gaunt to Fenris, attaching him to an X-shaped cross. Fenris says to Gaunt "welcome to the family son." Gaunt, apparently still unaware of his relationship to Fenris, accuses Fenris of killing his mother and uncle. Fenris, at first becomes enraged at Gaunt, then turns more subdued, calling Gaunt "son," and telling him that he loves him. Fenris explains, "I was once as you are now, human. I was killed Nicholas . . . I rose, resurrected, as something more than human and yet something less than a man, darker. Your mother loved me. She took me back." Gaunt says nothing, but is depicted with a look of wide-eyed shock on his face.

Fenris then offers Gaunt immortality, apparently attempting to convince Gaunt

to become a vampire. Fenris is then called away to attend to some unexplained business concerning a "vial." While Fenris is away, Gaunt overpowers and kills Angel. Fenris returns and is attacked by Gaunt. The two engage in a fierce struggle, demonstrating their martial arts skills and supernatural abilities. Gaunt, vowing never to join Fenris, finally kills him with a sword, yelling "For my mother . . . For my Uncle . . . For Me!", apparently feeling some retribution for Fenris' murder of his mother and uncle. Boxes of text then state, "The wolf is slain . . . and releases the son."

Gaunt has barely recovered from his struggle with Fenris when Maxwell Niphe appears. Gaunt attacks Niphe but is overpowered. Niphe then offers Gaunt a proposal: die at the hands of "Asgard's Monsters" or become a Thuggee, with the option of hunting renegade vampires if he still feels the urge to die. At this point it is unclear which route Gaunt has decided to follow.

The work ends with the introduction of a new character, Adolp Krupper, who is holding a vial—an image that recurs periodically throughout the story—and plotting revenge. The last few pages present images of Hargroves, Maggie Darden, Adolp Krupper and Gaunt.

### 2. *Dhampire: Stillborn*

*Dhampire: Stillborn* is the story of a troubled half-human, half-vampire young adult who searches to uncover the truth about his heritage and eventually chooses to become a full-fledged vampire. Like in *Matchsticks,* the main character's name is Nicholas Gaunt. Gaunt is depicted as a young, white male, with pale skin and short, dark, unkempt hair that falls in strands down the sides of his face. He is skinny, with little muscle tone, and has an elaborate tattoo of a cross on his left arm.

The story in *Dhampire,* which takes place in the present day, follows one story, which proceeds in a linear fashion interspersed with frequent flashbacks to Gaunt's childhood. The art work is depicted in a realistic style. The characters all appear human, with normal features and proportions and presentday clothing. When certain of the characters become vampires, they acquire fangs and pointed ears.

The story begins with close-up images of a razor blade, a wrist dripping blood and a pool of blood. It then switches to a scene of Gaunt in a bathroom attempting, for the third time, to commit suicide by slashing his wrists. Gaunt, trying to figure out why he is so troubled, recalls the story of his birth: born to a middle-aged widow, Gaunt was originally believed to have been stillborn, until an orderly taking him down to the morgue discovered that he was, in fact, alive. Gaunt is committed to a psychiatric ward, where he is assigned to Dr. Merrick.

Dr. Merrick, attempting to uncover the source of Gaunt's self-destructive behavior, reviews Gaunt's case file and the history of his early childhood. Dr. Merrick reveals that Gaunt suffered a seizure at three years old, after which he showed behavioral problems, including the killing and preservation of small animals. He also had a history of suicide attempts and of fighting with schoolmates, culminating in an episode in which he bit a fellow student on the neck and was expelled.

Suspecting that some early trauma caused Gaunt's emotional problems, Dr. Merrick convinces him to undergo hypnosis to release his repressed memories. Dr. Merrick tells Gaunt to picture himself in a long corridor full of doors behind which are events from his past. Looking through a small door, Gaunt sees his grandmother protecting him from his verbally abusive mother and his much older sister Natalie, who, he recalls, used to leave the family for long stretches of time. Looking through another door, Gaunt remembers an episode when he was three years old and Natalie appeared in his bedroom window as a vampire, with pale skin, fangs, pointed ears and long black hair

streaming in the wind, and attempted to take him away. Gaunt is saved by his grandmother, who scares Natalie away with a cross, tells young Gaunt that he's just had a bad dream and then drops dead on top of him.

Upon awakening from hypnosis, Gaunt, who had believed himself to be an only child, is shocked to hear from Dr. Merrick that he has a sister, but is convinced when Dr. Merrick presents him with Natalie's birth certificate. Equating Gaunt's heightened interest in finding out his family's secrets with increased psychological health, Dr. Merrick releases Gaunt from the hospital.

Gaunt immediately travels home to his mother's house in Philadelphia and confronts her with his newly discovered family secrets. Gaunt's mother reveals that Natalie was, in fact, not his sister but his mother, and that Natalie left Gaunt with her—- his grandmother—when he was just an infant. She also tells Gaunt that Natalie has been dead for twenty years. Asked about the identity of Gaunt's father, his "grandmother" says she does not know, but that Natalie frequently mentioned a gangster named "Izzy."

Confused by all of this new information, Gaunt visits a local strip club, where he catches the eye of a scantily clad stripper named Tanith, who is wearing a black leather bustier and gloves and a long blond wig. Tanith, newly dressed and now sporting a brunette close-cropped haircut, approaches Gaunt and later goes back to his hotel room to engage in sexual relations, an event which causes Gaunt to believe that his luck is finally changing for the better. During their post-coital conversation, Gaunt reveals his family secrets and Tanith offers to drive him to Bethlehem, Pennsylvania, the town in which he was born, in order to search for his father.

In Bethlehem, Gaunt searches out "Izzy," whose real name is the Iscariot, but discovers that Izzy is African–American and, therefore, obviously not his biological father. Upon Tanith's suggestion, the two decide to visit the graveyard where Natalie is buried. After a small spat and a brief separation, Gaunt discovers Tanith lying on the ground with a gaping bloody wound in her neck and looks up to find Natalie perched on top of her own tombstone, blood flowing from her mouth. Natalie then recounts for Gaunt the story of her life: kicked out the house by her father, Natalie traveled to New York City and became a prostitute. One night, having inadvertently given her services to a vice cop, Natalie was rescued by the Iscariot, who then took her in as a stripper at his club.

Natalie became the Iscariot's lover, but was kicked out when he discovered that she was pregnant (apparently the living dead despise pregnant women and children since they are reminders of vampires' unnatural state). Natalie returned to Bethlehem to give birth to Gaunt, but returned shortly thereafter to the Iscariot, who decided that she was ready for the "final kiss" and to be reborn as his bride.

Natalie informs Gaunt that his biological father is most likely the vice cop but that while pregnant, Natalie was bitten by the Iscariot, exposing Gaunt in utero to vampire venom. This exposure caused Gaunt to be born a "dhampire," a "half-human, half-vampire hybrid." According to Natalie, most dhampires are stillborn, and those that survive are possessed of dark appetites and moods, morbid interests and a relentless hunger that drives them to acts of "cannibalistic murder." Alarmed at the news of his unfortunate lineage, Gaunt flees back to his motel room.

Later, Tanith, reborn as a vampire, visits Gaunt and attempts to give him eternal life through her bite. Natalie arrives, however, and informs Gaunt that since he was born a dhampire, in order to become a full vampire he must make the decision to "damn [himself] by committing crimes so hideous that [he] is branded with the mark of Cain." Upon his violent death, he will

arise on the third night as one of the undead.

At the next scene, three months later, it is apparent that Gaunt has chosen to become a vampire. He has slaughtered at least five people, hanging them upside down from the ceiling with their blood draining into buckets below, repeating the images from the work's opening page. Gaunt dips his fingers in the blood and marks a red X over his heart. In a scene that Gaunt has set up, he is ambushed by police officers and then shot to death with a bullet through the X; his last word spoken is "father."

In the next and last scene, set in the graveyard, Natalie and Tanith call out to Gaunt, who rises from the earth. Natalie asks Gaunt if he is ready to meet his "sire." The last image of the work is a full-page drawing of Gaunt, now with pointed ears, fangs, and catlike pupils, responding "Ready? I was ready all my life."

## B. Hogan's Contact with Defendants

Plaintiffs created *Matchsticks* pursuant to an agreement with comic book publisher Neotek Iconography. *See* Hogan Dep., at 78–80, 111. In August 1994, however, after Neotek informed plaintiffs that it was going to pay them a royalty based on sales rather than the originally agreed upon page rate, plaintiffs elected to find another publisher. *See id.* at 119, 139.

In August or September of 1994, Hogan made an unsolicited cold-call to DC Comics and was put in touch with Axel Alonso ("Alonso"), an assistant editor. *See id.* at 142–44. Hogan called to inquire about getting work as an "inker" for DC Comics and to determine whether the company had any interest in publishing *Matchsticks*. *See id.* at 144–45. Alonso and Hogan first discussed Hogan's experience with inking

and DC Comics' methods for recruiting inkers, and Alonso offered to send Hogan some samples to ink to see if his style was compatible with DC Comics' other artists. *See id.* at 144–46.[1]

Hogan then attempted to sell *Matchsticks* to Alonso, telling him that it involved a story about vampires and the supernatural, and a character who has lost his memory of his past. *See id.* at 147. Hogan then asked Alonso whether DC Comics would look at *Matchsticks* if he sent it over and treat it as a "professional submission"; according to Hogan, he "made it clear that [he was] submitting it for the purpose of selling it." *Id.* at 147–48. Alonso answered affirmatively and inquired further about the work. *Id.* at 148. Hogan again asked Alonso if he was sure that he wanted Hogan to send him the work, and Alonso again responded positively. *Id.*

According to Hogan, he explained to Alonso that he had completed a draft for issues one through three of the series, but that he had ideas for additional stories for issues four through nine. *See id.* at 154. He explained that Gaunt would become a member of the Thuggie vampire group and commit more and more "heinous acts," with the "cliffhanger" of the story involving whether Gaunt would give in to his humanity or the monster inside of him. *See id.* Hogan also told Alonso about a subplot involving a "vial," over which Gaunt, a character named Adolph Krupper, the Thuggies, the "Inquisition" and "Sporn Tech" would struggle for control. *See id.* at 154–56. In addition, Hogan told Alonso how the relationship between Gaunt and Maggie Darden would "blossom into a doomed romance." *Id.* at 158.

Soon after this conversation, Hogan submitted a draft of the first three issues of *Matchsticks*. *See id.* at 166–67. Approximately one week later, Hogan placed a

---

1. Alonso asserts that he has no recollection of speaking with Hogan or of ever reviewing *Matchsticks* prior to the filing of this lawsuit. *See* Declaration of Axel Alonso in Support of Defendants' Motion for Summary Judgment, dated September 24, 1998 ("Alonso Decl."), at ¶ 5. For purposes of this motion, I assume that the interactions between Alonso and Hogan proceeded just as Hogan remembers it.

second call to Alonso to get DC Comics' impression of the comic book. *See id.* at 178. Alonso told Hogan that they had received the package and had reviewed it, but that it was not what they were looking for at that time. *See id.* Hogan received a package from Alonso some time thereafter containing a rejection letter for *Matchsticks* and some sample pages for Hogan to ink and return to DC Comics for evaluation. *See id.* at 179–80. Approximately one month later, Hogan sent the inking work back to DC Comics and also included another copy of issues one through three of *Matchsticks,* some covers, some advertising art, and a promotional matchbook-cover design, hoping that DC Comics would reconsider publishing the work. *See id.* at 182–184, 187.

## C. Creation of *Dhampire: Stillborn*

*Dhampire* was created by Nancy Collins, a free-lance writer and author of ten published novels and forty published short stories, including five novels featuring vampires, and free-lance artist Paul Lee. *See* Declaration of Nancy A. Collins in Support of Defendants' Motion for Summary Judgment, dated September 23, 1998 ("Collins Decl."), at ¶ 2; Declaration of Paul Lee in Support of Defendants' Motion for Summary Judgment, dated September 23, 1998 ("Lee Decl."), at ¶¶ 1, 3. The editor of the work was Lou Stathis ("Stathis"). During 1994, Alonso was a new assistant editor at DC Comics, whose responsibilities were comprised mostly of clerical and administrative tasks in assisting Stathis. *See* Alsonso Decl. at ¶ 3. According to Alonso, he first became aware of *Dhampire* in early 1996, when he started performing clerical work on the project. *See id.*

In July of 1996, by which time all of the editing on the project had been completed, Stathis became ill, and Alonso took over to supervise the final stages of production.[2]

*See id.;* Deposition of Matthew Alonso, dated November 14, 1997, Exhibit B to Declaration of Philip J. Iovieno ("Alonso Dep."), at 12. According to Alonso, at no time during the creation of *Dhampire* did he ever communicate with Collins or Lee about, or supply any ideas or suggestions for, the development of the story or the characters, or the characters' appearance. *See* Alonso Decl., at ¶ 3. Alonso also asserts that he does not recall speaking with Hogan or seeing *Matchsticks* prior to this suit, but that he is certain that he never discussed *Matchsticks* with Stathis, Collins, Lee or anyone else at DC Comics. *See id.* at ¶ 5.

According to Collins, she ran into Stathis, a friend, at an art opening in June of 1994. *See* Collins Decl. at ¶ 3. Stathis asked Collins whether she would be interested in authoring a painted graphic novel about vampires that would have a "Gothic feel" and appeal to "Generation X" teenagers. *See id.* Collins had just completed work on a novel entitled *Paint it Black,* which contains a half-human, half-vampire character named Jen, who is referred to in the work as a "dhampire." *See id.;* Defendants' Civil Rule 56.1 Statement ("Defs.' 56.1 Statement"), at ¶ 49; Plaintiffs' Counter–Statement of Material Facts Which are not in Dispute ("Pls.' 56.1 Statement), at ¶ 49; *See* Exhibits to Declarations in Support of Defendants' Motion for Summary Judgment (Defs.' Exhs."), at Exh. 2. Collins immediately suggested the idea of a half-human, half-vampire character based on Jen for the graphic novel, and Stathis, liking the idea, asked Collins to send him a proposal. *See* Collins' Decl. at ¶ 3.

A few days following this meeting, Collins began a partial preliminary proposal, jotting down in a notebook ideas for the story that eventually became *Dhampire. See* Defs.' Exhs., at Exh. 3. These notes also contain a list of names, all containing

---

**2.** Because Stathis died in May of 1997, there is no record of his testimony. Collins Decl. at ¶ 7.

the last name Gaunt paired with variations on "Nicholas," "Natalie," and other first names beginning with "N." According to Collins, she chose the name "Gaunt" as a derivative of the name of a bat-like creature called a "nightgaunt" that appears in the literature of science fiction writer H.P. Lovecraft and because "gaunt" connotes thinness and pallor, qualities associated with the "undead." *See* Collins Decl. at ¶ 4. She ultimately chose the first name "Nicholas" for a variety of reasons: she had just viewed the play *Nicholas Nickelby;* "Nick" is another name for the devil; and as a tribute to Jack Nicholson, who also believed his mother was his grandmother. *See id.*

On June 25, 1994, Collins prepared a handwritten draft letter to Stathis setting out her ideas. *See* Defs.' Exhs., at Exh. 5. In this letter, Collins set out the idea of an alienated "slacker" who discovers under hypnosis that the woman he thinks is his mother is really his grandmother and that his real mother is a teenager who was bitten by a vampire when she was pregnant, giving him vampire traits, and who later becomes a vampire after being shot and killed by cops. *See id.* Collins states in the letter that she is considering the titles *Dhampire, Dhampir, Vampire X, Bleake* and *Ghaunt. See id.*

On October 2, 1994, Collins forwarded a formal proposal for the work to Stathis. *See* Collins Decl. at ¶ 6. After DC Comics approved the project, Collins created a scene by scene breakdown, and then a script, from her home in Denver, Colorado. *See id.* at ¶¶ 6–7. Up until July 1996, Collins worked with Stathis, the editor on the project, although she claims that his role "consisted mainly of fixing and tightening language and improving the flow of the narrative" and that he did not provide her with story ideas or reference materials. *See id.* at ¶ 7. In July of 1996, when Stathis became ill and Alonso took over, the script and most of the artwork had been completed. *See* Collins Decl. at ¶ 7.

DC Comics asked Lee to provide the painted art for *Dhampire* in January 1996. *See* Lee Decl., at ¶ 4. Lee created character sketches based on written descriptions of the characters and a written synopsis of the story that Stathis had provided, as well as photographs that he took of models. *See id.* After DC Comics approved his character sketches, they sent him scene-by-scene breakdowns, from which he created thumbnail sketches. *See id.* Once these sketches were approved, he painted each of the panels in the work. *See id.* Lee claims never to have seen *Matchsticks* prior to this litigation. *See id.* at ¶ 5.

Toward the end of 1994, after Collins submitted to DC Comics the formal proposal for the "one-shot" issue of *Dhampire,* Stathis asked Collins whether she would be interested in developing the graphic novel into a monthly series. *See* Deposition of Nancy Collins, dated July 8, 1998 ("Collins 7/8/98 dep."), Exhibit D to Iovieno Decl., at 6–7. During the next four to six weeks, Collins prepared plot outlines for three or four "story arcs," each of which would result in three or four issues. In these outlines, Gaunt is drawn deeper and deeper into the world of vampires, eventually killing the Iscariot and Natalie. *See id.* at 11; Defs.' Exhs., at Exh. I. After a script for issue two was completed and some artwork for the second issue was drawn, DC Comics canceled the series. *See* Collins 7/8/98 Dep., at 32–34.

## III. Discussion

### A. Copyright Infringement

■ To establish a claim of copyright infringement, a plaintiff must prove: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Telephone Service Co., Inc.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Because defendants, for the purpose of this motion, have not contested plaintiffs' ownership of a valid

copyright, only the second element is at issue.

■ Copying may be established "either by direct evidence of copying or by indirect evidence, including access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony." *Castle Rock Entertainment, Inc. v. Carol Pub. Group, Inc.,* 150 F.3d 132, 137 (2d Cir.1998) (citing *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 140 (2d Cir.1992).) The level of similarity needed to establish copying is now commonly referred to as "probative similarity." *See id.; Repp v. Webber,* 132 F.3d 882, 889 n. 1 (2d Cir.1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 52, 142 L.Ed.2d 40 (1998). Once copying has been established, a plaintiff must next demonstrate that the copying was unlawful by showing that there is a substantial similarity between the protectable elements in the two works. *See Castle Rock,* 150 F.3d at 137; *Williams v. Crichton,* 84 F.3d 581, 587 (2d Cir.1996).

### 1. Access

■ Defendants argue that plaintiffs cannot prove that Collins and Lee, creators of *Dhampire,* ever had access to *Matchsticks.* Both Collins and Lee have submitted declarations stating that they never saw *Matchsticks* until the instigation of this lawsuit. *See* Collins Decl. at ¶ 8; Lee Decl. at ¶ 6. Alonso also submitted a declaration stating that he never provided *Matchsticks* to Collins, Lee or Stathis, and never discussed the work with any of them. *See* Alonso Decl., at ¶ 5.

The editor of *Dhampire,* however, was Lou Stathis, and Alonso, the person at DC Comics to whom Hogan sent *Matchsticks,* was Stathis' assistant during the time that *Dhampire* was created. Alsonso also took over as editor of *Dhampire* after Stathis became ill and is listed as the assistant editor on the work. Moreover, Collins was in contact with Stat his and Alonso over the telephone during the time that she was writing the *Dhampire* script. *See* Deposi-

tion of Nancy A. Collins, dated November 13, 1997 ("Collins 11/13/97 Dep."), at 105 08. These facts are "sufficient to show a reasonable possibility" of access to *Matchsticks* and, therefore, to place the issue in dispute. *See Sylvestre v. Oswald,* 91 Civ. 5060, 1993 WL 179101, at *3 (S.D.N.Y. May 18, 1993) ("access generally needs to be proved by showing a particular chain of events or 'link' by which the alleged infringer might have gained access to the work"); *Gaste v. Kaiserman,* 863 F.2d 1061, 1067 (2d Cir.1988) ("[a]ccess through third parties connected to both a plaintiff and a defendant may be sufficient to prove a defendant's access to a plaintiff's work").

### 2. Substantial Similarity

■ It is beyond dispute that copyright protection extends only to the expression of ideas, and not to the ideas themselves. *Williams,* 84 F.3d at 587; *Kregos v. Associated Press,* 3 F.3d 656, 663 (2d Cir.1993). In applying this often difficult distinction between ideas and expression, courts have frequently looked to the formulation set forth by Judge Learned Hand:

> Upon any work ... a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the [work] is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the [author] could prevent the use of his "ideas," to which, apart from their expression, his property is never extended.

*Nichols v. Universal Pictures Corp.,* 45 F.2d 119, 121 (2d Cir.1930); *Warner Bros. Inc. v. American Broadcasting Companies, Inc.,* 654 F.2d 204, 208 (2d Cir.1981) ("*Warner I*"); *see also* Z. Chafee, *Reflections on the Law of Copyright,* 45 Colum. L.Rev. 503, 515 (1945) ("the line [lies] somewhere between the author's idea and the precise form in which he wrote it down

... protection covers the 'pattern' of the work ... the sequence of events, and the development of the interplay of characters").

■ Similarly, "scenes a faire," which have been described as "scenes that necessarily result from the choice of a setting or situation," *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir.1986), "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic," *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 979 (2d Cir.1980), and "thematic concepts ... which necessarily must follow from certain plot situations," *Reyher v. Children's Television Workshop*, 533 F.2d 87, 91 (2d Cir.1976), are not entitled to copyright protection. *See generally* 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.03[B][4], at 13–71 to –73 (1998). For example, the Second Circuit has found the following elements to be non protectable scenes a faire: "drunks, prostitutes, vermin and derelict cars" in a depiction of policemen in the South Bronx, *Walker*, 784 F.2d at 50, and "electrified fences, automated tours, dinosaur nurseries, and uniformed workers" in a story about a dinosaur zoo, *Williams*, 84 F.3d at 589.

■ Thus, in comparing two works a court must determine "whether the similarities shared by the works are something more than mere generalized idea[s] or themes." *Walker*, 784 F.2d at 48, 49 (citing *Warner I*, 654 F.2d at 208). The works must share a similarity of expression, such as "similarities of treatment, details, scenes, events and characterization," *Reyher*, 533 F.2d at 91, or a similarity in their "total concept and feel." *Williams*, 84 F.3d at 589.[3]

■ In determining whether two works are substantially similar, courts in this circuit have applied the "ordinary observer test" and asked "whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Warner I*, 654 F.2d at 208 (citing *Ideal Toy Corp. v. Fab–Lu Ltd.*, 360 F.2d 1021, 1022 (2d Cir. 1966)). Where a work contains elements that are both protectable and non-protectable, this analysis has been described as the discerning ordinary observer test. *See Williams*, 84 F.3d at 588; *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1002 (2d Cir.1995). Pursuant to this test, a court must "attempt to extract the unprotectable elements from [its] consideration and ask whether the protectable elements, standing alone, are substantially similar." *Knitwaves*, 71 F.3d at 1002; *Williams*, 84 F.3d at 588. Even when two works are dissimilar in many respects, substantial similarity between them may still be found where their similarities are important in the overall context, whether qualitatively or quantitatively. *See Williams*, 84 F.3d at 588.

■ Even in applying the ordinary observer or discerning ordinary observer test, however, a court must examine the "total concept and feel" of the work. *Knitwaves*, 71 F.3d at 1003. Moreover, even a compilation of unprotectable elements may enjoy copyright protection when those elements are arranged in an original manner. *See id.* at 1003–04 (quoting *Feist*, 499 U.S. at 362, 111 S.Ct. 1282); *Softel, Inc. v. Dragon Medical and Scientific Communications, Inc.*, 118 F.3d 955, 964 (2d Cir. 1997).

■ In determining whether characters are similar, a court looks at the " 'totality of [the characters'] attributes and traits' as well as the extent to which the defendants' characters capture the 'total

---

3. The Second Circuit has stated that looking at the total "look and feel" of a work is particularly appropriate in an action involving children's works. *Williams*, 84 F.3d at 589. Although the works at issue here are aimed at young adults, the same principal would appear equally applicable, as comic books generally lack the complexity in plot and character of adult works such as novels.

concept and feel' of figures in [plaintiff's work]." *Walker,* 784 F.2d at 50 (quoting *Warner Bros. v. American Broadcasting Cos.,* 720 F.2d 231, 241 (2d Cir.1983) (*"Warner II"*)). The Second Circuit has provided the following guidance in the analysis of whether one character infringes another:

> [w]hat the character thinks, feels, says and does and the descriptions conveyed by the author through the comments of other characters in the work episodically fill out a viewer's understanding of the character. At the same time, the visual perception of the character tends to create a dominant impression against which the similarity of a defendant's character may be readily compared, and significant differences readily noted.

> Ultimately, care must be taken to draw the elusive distinction between a substantially similar character that infringes a copyrighted character despite slight differences in appearance, behavior, or traits, and a somewhat similar though non-infringing character whose appearance, behavior, or traits, and especially their combination, significantly differ from those of a copyrighted character, even though the second character is reminiscent of the first one.

*Warner II,* 720 F.2d at 241–42.

■■■ A stock character or basic character type, however, is not entitled to copyright protection. *Robinson v. Viacom International, Inc.,* 93 Civ. 2539, 1995 WL 417076, at *9 (S.D.N.Y. Jan. 4, 1995); *Sinicola v. Warner Bros.,* 948 F.Supp. 1176, 1185 (E.D.N.Y.1996). "No character infringement claim can succeed unless plaintiff's original conception sufficiently developed the character, and defendants have copied this development and not merely the broader outlines." *Smith v. Weinstein,* 578 F.Supp. 1297, 1303, *aff'd mem.,* 738 F.2d 419 (2d Cir.1984); *see also Nichols,* 45 F.2d at 121 ("the less developed the characters, the less they can be copyrighted; that is the penalty an author must bear for marking them too indistinctly").

Substantial similarity is generally a question of fact for a jury. *See Hoehling,* 618 F.2d at 977. Summary judgment is appropriate on this issue, however, where "the similarity concerns only noncopyrightable elements of plaintiff [sic] work or no reasonable trier of fact could find the works substantially similar." *Williams,* 84 F.3d at 587 (quoting *Walker,* 784 F.2d at 48).

### 3. Comparison of the works

■■■ Plaintiffs assert that *Matchsticks* and *Dhampire* share the following elements: (1) both works contain a half-human, half-vampire main character named Nicholas Gaunt, who is a young white male with "pale skin, a medium build, dark and tired eyes, dark hair that is scraggly, short and unkempt"; (2) both characters seek to uncover the truth about their origins and both learn about their origins through flashbacks or memories; (3) both characters are faced with the choice of pursuing good or evil; (4) both characters are indoctrinated into the forces of evil by killing; (5) both characters have a "sinister genealogy"; (6) both characters have a developing romance; (7) both works use similar imagery, such as religious symbolism, biblical allusions and the use of doors to see into the past; and (8) both works have a "macabre" feel, including scary characters and dark, haunted scenes.

Most of these similarities, however, are unprotectable ideas and themes that do not represent any original elements of plaintiffs' work. The two works share a similar basic underlying idea: they both involve a half-vampire character who is on a quest that leads him to discover his origins. Almost all of the remaining similarities between the works are unprotectable themes and concepts that flow predictably from this idea. A half-vampire, half-human character would necessarily have a "sinister genealogy." The quest of a half-vampire who is searching for his origins would predictably involve a struggle and ultimate choice between good and evil, as

the very essence of the character and the story is that such character has a "dual nature," and the use of flashback or memory is the most logical way to portray events from that character's past. The fact that the characters become indoctrinated into the forces of evil by killing is a similarly unprotectable theme that is not uncommon to horror or science fiction literature.

Although all of these components are unoriginal, and therefore, unprotectable elements, plaintiffs could still prevail on a claim for copyright infringement if the way in which the two works express these ideas is substantially similar or these elements have been combined in an original way. *See Walker*, 784 F.2d at 50 (scenes a faire copyrightable only to extent they are "given unique ... expression"). After a careful examination of the works, however, I find that the differences in plaintiffs' and defendants' treatment of these ideas, including the differences in their total look and feel, the interactions of the characters and the plot are so pronounced, that no reasonable jury could find that the works are substantially similar.

a. Setting, "total concept and feel"

■ Plaintiffs are correct that both works have a "macabre feel," involving dark scenes, scary characters and violence. The works are extremely different however, in their setting and "total concept and feel." *Matchsticks* is a black-and-white comic book set in the year 2017, which is portrayed as a dark fantasy world. The artwork is crude and scratchy and has an "underground" look to it, and the tone is irreverent and, at times, sarcastic and angry. The work is inhabited by strange futuristic characters, such as Maxwell Niphe and Inquisitor Hargroves, some of whom have technology incorporated into their bodies or wear robot-like armor. The work skips quickly among multiple story lines and subplots involving these different characters, shifting to and from Gaunt, members of the Church Group at St. Patrick's Cathedral, Fenris' home at the Asgard Estate, and Maxwell Niphe at his unidentified lair. The work appears to incorporate inside jokes and hidden symbolism and is quite difficult to understand on a first reading.

*Dhampire*, in contrast, is a color painted graphic novel that presents a world that is much more realistic. It is set in the present day, and the characters are realistically drawn; even the vampires look like real people who have sprouted fangs and pointed ears. The story is much more linear than the one in *Matchsticks*, and it focuses exclusively on Gaunt's present-day quest to find his father and flashbacks to Gaunt's childhood and his mother's past.

b. Characters

The most obvious similarity between the main characters in *Matchsticks* and *Dhampire* is that they share the same name: Nicholas Gaunt. This shared trait, by itself, is insufficient to establish substantial similarity between the characters. *See CK Co. v. Burger King Corp.*, 92 Civ. 1488, 1994 WL 533253, at *8 (S.D.N.Y. Sept. 30, 1994), *aff'd*, 122 F.3d 1055, 1995 WL 595526 (2d Cir.1995). It is, however, a significant similarity. In addition, both Gaunts are half-vampire and half-human.[4] This characteristic is clearly a non-protectable idea that is in the public domain.[5] In

4. Defendants contend that there is nothing in *Matchsticks* to indicate that Gaunt is half-vampire. Although there is no explicit statement to that effect anywhere in the work, the story suggests in multiple places that Gaunt is the son of Fenris, who by all accounts appears to be some sort of vampire. Although no mention is made of Gaunt's mother, it is a reasonable inference that Gaunt is a half-vampire.

5. According to Slavonic folklore, a dhampire was the product of a union between a vampire and his widow. Such dhampires were effective in detecting and destroying their vampire families and often made a living as vampire slayers. *See* Collins Decl. at ¶ 13; Defs' Exhs., at Exh. 8. This idea has been expressed in popular culture as well. For example, in 1973, Marvel Comics' *Tomb of Dracula* introduced the comic book character Blade, who is a half-human, half-vampire

addition, the way in which the two Gaunts become half-vampires is different in the two works. *Dhampire*'s Gaunt has vampire characteristics because his mother was bitten by a vampire when she was pregnant. *Matchstick*'s Gaunt, in contrast, has a vampire father and, according to plaintiffs, contains latent vampire genes.

Both characters are white males who appear to be in their early twenties. Both have thin-to-medium builds, pale skin, dark messy hair and a slovenly appearance. Despite these similarities, which are characteristics common to a great many "Generation X" post-adolescents, the two characters are drawn quite differently. Plaintiffs' Gaunt, although he changes somewhat from scene to scene, has an oval face with a long nose; his hair is usually pictured as a bushy clump on the side of his head, and he wears a jacket with a large collar with a box-like pattern and similar cuffs. Defendants' Gaunt has a heart-shaped, angular face, with pronounced cheekbones and hair that hangs in long strands down the sides of his face and comes to a widow's peak in the middle of his forehead; he has tattoos on both arms and usually wears a black leather motorcycle jacket.

The interactions between the characters are also quite different. Defendants' character has a clinical relationship with a psychiatrist who attempts to help him, a troubled relationship with the woman he thought was his mother and who resented having to raise him, and a romantic relationship with Tanith, who accompanies him on his quest. Unlike plaintiffs' character, he has no contact with his biological father and minimal interaction with his vampire father.

Plaintiffs' character, in contrast, interacts on a personal, human level only with

Stanz, the man who raised him after the death of his mother, and despite plaintiffs' assertion to the contrary, experiences no romantic relationships. The work is filled with strange characters, such as the several-thousand-year-old Maxwell Niphe, and the seemingly evil Inquisitor Hargroves. Gaunt has no interaction with many of these characters; the extent of his relationship with the remainder is that they attempt to kill or capture him.

### c. Sequence of events, plot

In addition, the sequence of events of the characters' discovery of their origins is very different. Sent a note and a key to a hotel room at the beginning of *Matchsticks*, plaintiff's character is thrown into a mystery, and he uncovers the truth about his heritage and takes the steps necessary to becoming a vampire through the attempts of Fenris, his father, to kill or capture him. At first, Fenris sends Kat to kill Gaunt; it is through Gaunt's killing Kat that his memories about the murder of his mother and uncle are triggered and he is inspired to go to Albany, his home town. Gaunt never expresses any doubts about his own identity or familial origins; he appears to be motivated by the desire to find out the identity of the person who murdered his mother and uncle and who sent Kat to kill him in turn. While Gaunt is in Albany, Zodiac, who is also allied with Fenris, also attempts to kill him. This event causes Gaunt to visit Stanz's house, where he again experiences memories from his childhood and engages in a confrontation with members of the Inquisition Group. Gaunt finally learns that Fenris is his father after Fenris dispatches Sharkey and Angel to capture him. Gaunt engages in a violent confrontation with Fenris, with each displaying their martial arts abilities,

vampire hunter; Blade starred in his own comic book series from July 1994 to April 1995. *See* Collins Decl., at ¶ 13; Reply Declaration of Nancy A. Collins in Further Support of Defendants' Motion for Summary Judgment, at ¶ 2, Exhs. A, B attached thereto. In addition, prior to the events in this lawsuit,

Collins, the author of *Dhampire*, completed work on a novel containing a character named Jen, who was a half-human, half-vampire who acquired his vampire traits because his pregnant mother was bitten by a vampire. *See* Collins Decl., at ¶ 3.

that ends with Gaunt killing Fenris and vowing never to join him.

In *Dhampire*, by contrast, Gaunt is not pursued by anyone. He is obviously depressed, alienated and suicidal; the focus of the work is his quest to uncover the root of psychological problems, which he discovers is due to his vampire genealogy. Gaunt is motivated to discover the truth about his past after being convinced to undergo hypnosis by a psychiatrist who believes that the source of his despair lies in his past. Gaunt searches out the woman he believes is his mother, who reveals that Natalie is his real mother. Tanith suggests that Gaunt travel to the town where he was born; visiting a graveyard in that town, Gaunt encounters the undead Natalie, who reveals his true history and identity and later tells him that he can choose whether to become one of the undead. Unlike plaintiffs' character, who kills when attacked or captured by his father and his creatures, defendants' character kills innocent people in order to purposefully become a full-fledged vampire.

### d. Other elements

Finally, plaintiffs point to other similar elements between the works. The use of imagery of blood, religious symbolism such as crosses and allusions to the bible are unprotectable scenes a faire without which any vampire work would be incomplete. *Dhampire* utilizes this religious imagery in a minor way: a character uses a cross to scare away a vampire— a standard use of such image in vampire lore— and the name of Gaunt's birthplace is Bethlehem. *Matchsticks*, in contrast, has a subtext of anti-religious imagery and phrases running through the work that could be read as an attack on organized religion. For example, the Inquisition Group reads as a sinister parody of the Catholic Church, dis-

patching violent warriors around the world to kill and wreck havoc.[6]

Finally, plaintiffs point to a few remaining similar elements, such as the use of the symbolism of doors. These remaining features, however, amount to no more than "random similarities" between the works and are of little importance in the works. *See Williams*, 84 F.3d at 590;

Because the similarities between *Matchsticks* and *Dhampire* relate only to unprotectable ideas and scenes a faire, and the similarities in their expression are so greatly outweighed by their differences, I find that no reasonable trier of fact could find the works substantially similar. *See Arden v. Columbia Pictures Inds., Inc.,* 908 F.Supp. 1248 (S.D.N.Y.1995) (summary judgment appropriate where two works telling the story of man trapped in a repeating day not substantially similar); *Robinson*, 1995 WL 417076, at * 11 (no substantial similarity between two works about the interplay between a contemporary family and a 1950s era television family); *Denker v. Uhry*, 820 F.Supp. 722 (S.D.N.Y.1992), *aff'd*, 996 F.2d 301 (2d Cir. 1993) (no substantial similarity between two works about an elderly white Jewish person requiring the assistance of a black helper who is initially disliked and later becomes a friend); *Reyher*, 533 F.2d at 93 (summary judgment appropriate because idea of lost child describing mother as most beautiful woman in the world and then reuniting with mother, who is actually unattractive, not expressed in substantially similar manner in two children's works); *cf. Lone Wolf McQuade Assoc. v. CBS Inc.,* 961 F.Supp. 587 (S.D.N.Y.1997) (reasonable jury could conclude that characters with numerous similarities are substantially similar); *Twentieth Century– Fox Film Corp. v. MCA, Inc.,* 715 F.2d 1327 (9th Cir.1983) (material issue of fact

---

**6.** In one scene, for example, members of the Inquisition Group's Swiss Armour Guard discuss how they "rolled over Bosnia" slaughtering "blood and souls for the mother church," with the "s" in "souls" depicted as a dollar sign. In another scene, a scantily clad woman in a nun's habit performs torture on an altar boy; she wears a belt that says "Souvenir of the Brides of Christ Wedding Chapel."

**314**

as to whether expression of plaintiff's ideas was copied).

## B. Misappropriation

■ Plaintiffs claim that defendants misappropriated their novel idea for a comic book "which has been entirely devoted to a main character who is half-human, half-vampire and the particular struggles and the specific problems presented by this dual nature," in particular a character who lacks knowledge about his identity, is driven to discover his past, and struggles between good and evil. New York courts recognize claims for misappropriation of ideas where the following conditions are satisfied: (1) the requisite legal relationship exists between the parties and (2) the idea is novel and concrete. *See McGhan v. Ebersol,* 608 F.Supp. 277, 284 (S.D.N.Y. 1985).

■ The test for novelty is a stringent one: the idea must "show genuine novelty and invention, and not merely a clever or useful adaptation of existing knowledge." *Paul v. Haley,* 183 A.D.2d 44, 588 N.Y.S.2d 897, 903 (2d Dep't 1992); *Murray v. National Broadcasting Co., Inc.,* 844 F.2d 988 (2d Cir.1988) (idea for a sitcom involving an intact, nonstereotypical African–American family not novel even though such idea had never been portrayed on television before). Even where an idea is novel, however, a misappropriation claim will be defeated if a defendant can show that she independently created the idea. *See Paul,* 588 N.Y.S.2d at 905; *AEB & Assocs. Design Group, Inc. v. Tonka Corp.,* 853 F.Supp. 724, 734 (S.D.N.Y. 1994) (no recovery where party "arrived on its own initiative or by wholly independent means at a concept similar to that devised by the party seeking recovery"); *McGhan,* 608 F.Supp. at 286 (plaintiff cannot claim an idea is novel if defendant has already used the idea).

■ Defendants have effectively rebutted the presumption that they misappropriated plaintiffs' idea for a comic book centered around the struggles of a half-vampire, half-human character who is driven to understand his origins and struggles between good and evil. Collins filed a declaration that she originally discussed the idea of creating a graphic painted novel with a Gothic feel centered around a half-vampire character with Stathis in June of 1994. *See* Collins Decl. at ¶ 3; Collins 11/13/97 Dep. Defendants have submitted excerpts from a novel Collins authored prior to that time, which features a dhampire character who gained his vampire traits after his mother was bitten by a vampire while he was in utero and who served as the inspiration for Gaunt in *Dhampire.* Defs.' Exhs., at Exh. 2; Collins Decl. at ¶ 3. In addition, defendants have submitted a draft of a letter dated June 25, 1994, that Collins wrote to Stathis, in which she sets out her ideas for *Dhampire:* a story of an "alienated, death-obsessed Generation X slacker" who discovers under hypnosis that his mother is really his grandmother and his mother was a teenager bitten by a vampire while she was pregnant, giving him vampire traits, and who ends up becoming a killer, being shot by cops and then coming back as a vampire. All of these events happened prior to August 1994, the earliest time that Hogan could have contacted DC Comics. *See* Hogan Dep., at 119, 139, 142–44.

Thus, defendants have come forward with "convincing documentary evidence establishing independent creation" of the ideas contained in *Dhampire. cf. Langman Fabrics v. Graff Californiawear, Inc.,* 160 F.3d 106 (2d Cir.1998) (defendant whose evidence of independent creation presented only "undocumented assertions" of persons associated with defendants failed to rebut plaintiff's prima facie case of copying).

## IV. Conclusion

For the reasons set forth above, defendants' motion for summary judgment is

granted. The clerk is directed to close the case.