**Patrick KINSELLA, Plaintiff–Appellant,**

v.

**Donald H. RUMSFELD, Secretary, Department of Defense, Defendant–Appellee.**

**No. 02–6029.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 28, 2002.

Decided: Feb. 19, 2003.

Shawn F. Brousseau, Napierski, Vandenburgh & Napierski, L.L.P., Albany, NY, for Appellant.

Elizabeth S. Riker, Assistant United States Attorney (Joseph A. Pavone, United States Attorney for the Northern District of New York; William F. Larkin, Assistant United States Attorney, of counsel), Syracuse, NY, for Appellee.

Before: FEINBERG, JACOBS, and SACK, Circuit Judges.

SACK, Circuit Judge.

Plaintiff Patrick Kinsella appeals from the decision of the United States District Court for the Northern District of New York (Howard G. Munson, *Judge* ) granting the defendant's motion for summary judgment and dismissing the complaint, which alleges the defendant's discriminato-

ry termination of and failure to promote Kinsella in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* Kinsella argues that he elicited sufficient evidence from which a finder of fact could properly conclude that his employment was terminated and that he was denied promotion because of his disability. We conclude that he submitted sufficient evidence to survive the motion for summary judgment with respect to his unlawful termination claim but not with respect to his failure to promote claim. Accordingly, we affirm in part, and vacate and remand in part.

## BACKGROUND

### Standard of Review

We review a district court's grant of summary judgment *de novo,* construing the evidence in the light most favorable to the nonmoving party. *Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999), *cert. denied,* 529 U.S. 1098, 120 S.Ct. 1832, 146 L.Ed.2d 776 (2000). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law," Fed.R.Civ.P. 56(c), i.e., "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A fact is "material" for these purposes if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* We therefore note at the outset that because we are required to construe the evidence in the light most favorable to the plaintiff, and therefore recite the facts in that manner, the account that follows may not reflect the facts that would be found by a finder of fact after a full trial.

### Factual Background

Kinsella was born with a coloboma[1] present in each eye. As a result, he has been legally blind all his life. Without correction, his vision is 20/600 in his right eye and 20/700 in his left eye. With correction, his vision is 20/200 in both eyes. Because of his impairment, he cannot drive, cannot shop or travel alone, and cannot read without the aid of a magnifying glass.

In 1986, despite the severe problems with his eyesight, Kinsella was hired by the United States Air Force to work as a "Copier/Duplicator Equipment Operator" in its printing shop located at the Griffiss Air Force Base ("Griffiss") in Rome, New York. In 1989, Kinsella was moved to the Air Force's Rome Laboratories facility, which was less than half a mile from the Griffiss facility, where he continued to be a Copier/Duplicator Equipment Operator, but took on additional responsibilities. His new duties included operating and maintaining a high speed copier, color copier, drill press, laser cutter, and sta-

---

1. A coloboma is a gap in part of the structures of the eye. This gap can occur in a range of areas and be large or small.

   The most common form of gap is caused by an imperfect closure of a cleft, present in the womb but usually closed by birth date. This gap can occur in the eyelid, iris, lens, choroid or optic disc.

   Royal National Institute of the Blind (UK) Website, http://www.rnib.org.uk/info/coloboma.htm (last visited, February 4, 2003). The record does not specify in which part of the eye Kinsella's coloboma was present.

pler. Kinsella repeatedly requested that his job with its augmented responsibility be reclassified as a "Bindery Machine Operator," which would entail a promotion and increase in pay, arguing that he was effectively fulfilling the requirements of that job anyway. He received no promotion, however, remaining a Copier/Duplicator Equipment Operator throughout his employment by the defendant.

In April 1992, the Navy's Defense Printing Service ("DPS") assumed control of both the Griffiss printing facility and the Rome Laboratories printing facility. According to the deposition testimony of Robert Voisine, Kinsella's immediate supervisor at the Rome Laboratories, Robert Feller, then director of DPS facilities at Griffiss, told Voisine at or shortly after that time that "he [Feller] didn't know how Patrick [Kinsella] got into the position he was in, being blind, and he didn't feel that we could keep a blind guy working as a printer or copier operator." Voisine dep. at 14. In April 1993, Kinsella filed an informal complaint with DPS's Equal Employment Opportunity ("EEO") counselor, alleging that Feller had threatened Kinsella with disciplinary action because of his disability. Kinsella did not pursue his April 1993 complaint.

In October 1993, John Peterson replaced Feller as director of DPS printing facilities at Griffiss. Peterson conducted efficiency surveys and determined that the two printing facilities—Griffiss and Rome Laboratories—were "less than 40 percent efficient." Peterson dep. at 17. After trying various other methods to improve efficiency, Peterson decided to consolidate the Griffiss and Rome Laboratories printing facilities and reduce the number of employees at the combined operation.

In October 1994, Peterson received permission to execute a reduction in force ("RIF"). The following month, he notified the eight DPS employees at the combined operation that their positions would be eliminated as of January 1995 to improve efficiency and productivity. In their place, three new Bindery Machine Operator positions were to be created, leaving a three-person print shop at the Rome Laboratories facility. Kinsella was told that he did not qualify for any of the three Bindery Machine Operator jobs.

According to Voisine's deposition testimony, prior to the RIF, Peterson had a conversation with Voisine about post-RIF staffing of the shop.

> [T]he gist [of what Peterson told Voisine] was [that Peterson] didn't understand how [Kinsella] got hired for the job in the first place, and this new organization was not going to be able to run with him.... They just did not believe that a blind person could run copiers and do print work.

Voisine dep. at 21.

Although only three of the DPS employees were rehired in the print shop, all the former print shop employees were hired by the Defense Department—except Kinsella. Before the RIF, eight employees performed print work for DPS at the two different print shop locations. Robert Voisine, Deborah Boudreau, and Patrick Kinsella worked at the Rome Laboratories location. Voisine was the supervisor and Boudreau and Kinsella operated and maintained the machines. Less than a half a mile away, at the Griffiss location, Frank Loomis was supervisor, Diane Peters inputted print orders, and Gary Staudy, Steven Rocchio and Timothy Jones ran the offset duplicator presses. Immediately after the RIF, Voisine, Loomis, and Jones, all senior to Kinsella, continued to work for DPS in the Rome Laboratories print shop, filling the three newly created Bindery Machine Operator positions. After the RIF, the Defense Finance and Accounting

Service of the Department of the Army ("DFAS"), a Defense Department organization distinct from DPS, created a print shop in the same building as the DPS Rome print shop, and hired Boudreau, who was junior to Kinsella and whom Kinsella had trained at the Rome Laboratories print shop. The DFAS print shop job, which was temporary, was not posted and Boudreau did not apply for it, but she received the job anyway. Boudreau remained in that position, operating DFAS's two printing machines, until September 1995 when DFAS offered her a permanent position in its accounting department. DFAS later hired all the other pre-RIF DPS print shop employees: Loomis and Staudy to work in its newly created print shop, Rocchio to work in the mailroom, and Peters to work in accounting. Only Kinsella was never rehired at the Griffiss or Rome Laboratories locations.

After the RIF, Kinsella was offered a job as a military pay clerk in Scotia, New York. But Scotia is more than 90 miles from Rome and Griffiss. The job was not a realistic option for Kinsella particularly in light of his inability to drive, so he did not accept it. Kinsella remained unemployed until April 1995, when he found a part-time job with lower pay and fewer benefits, as a toll collector for the New York State Thruway Authority.

Although DFAS management was distinct from DPS management, Peterson conceded at his deposition that the newly created DFAS print shop was under his supervision. Peterson further testified that he asked DFAS management to consider offering employment to those discharged from DPS, but did not identify particular candidates for particular positions.

Kinsella filed an informal complaint with the DPS EEO counselor on December 1, 1994, followed by a formal complaint to DPS on January 12, 1995. DPS understood Kinsella's complaint to allege that DPS discriminated against him on the basis of disability (1) in informing him that he did not qualify for one of the three Bindery Machine Operator positions that were to remain after the RIF; (2) in failing, since 1992, to reclassify his position as a Bindery Machine Operator; and (3) in Robert Feller's 1992 remark that he did not want to "keep a blind guy working as a printer or copier operator." DPS accepted the first allegation for investigation,[2] but denied Kinsella's other two allegations because they were time barred. Kinsella appealed DPS's rejection of two of his allegations to the Equal Employment Opportunity Commission ("EEOC"), which vacated and remanded the matter for further investigation by DPS. Upon further investigation, DPS reaffirmed its previous conclusion, and Kinsella once again appealed to the EEOC. This time the EEOC affirmed, and informed Kinsella of his right to pursue a civil action. On July 21, 1999, Kinsella filed the current action in the Northern District of New York alleging that he had been denied promotion and continued employment because of his disability in violation of the Rehabilitation Act of 1973. On November 27, 2001, the district court (Howard G. Munson, *Judge*) granted the defendant's motion for summary judgment and dismissed the complaint. *Kinsella v. Rumsfeld,* 180 F.Supp.2d 363, 371 (N.D.N.Y.2001). Kinsella appeals, arguing that he has submitted evidence from which a finder of fact could conclude that Kinsella was both dis-

---

**2.** DPS thereafter completed its investigation of this allegation and concluded that there was no discrimination.

charged and denied promotion because of his disability.

## DISCUSSION

### I.  Discriminatory Termination

■■■ To establish a prima facie case of discriminatory termination in violation of the Rehabilitation Act of 1973, a plaintiff must show (1) that the plaintiff is handicapped within the meaning of the Act; (2) that the plaintiff is otherwise qualified to perform the job; (3) that the plaintiff was discharged because of his or her handicap; and (4) that the employer is a recipient of federal financial assistance. *Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 722 (2d Cir.1994), *cert. denied*, 513 U.S. 1147, 115 S.Ct. 1095, 130 L.Ed.2d 1063 (1995). After the plaintiff has established a prima facie case, the burden shifts to the defendant to provide a legitimate non-discriminatory reason for the discharge. The plaintiff retains the ultimate burden of persuasion and must show, using "evidence constituting the prima facie case, together with supportable inferences to be drawn from the false or erroneous character of the employer's proffered reason," *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 134–35 (2d Cir.) (citation and quotation omitted), *cert. denied*, 530 U.S. 1261, 120 S.Ct. 2718, 147 L.Ed.2d 983 (2000), that the defendant's proffered reason was pretextual. "Summary judgment is appropriate … only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact." *Id.* at 135.

The defendant concedes that Kinsella is disabled within the meaning of the Rehabilitation Act, that he was otherwise qualified for his job, and that the Defense Department is federally funded. It contests only Kinsella's assertion that his employment was terminated because of his disability. The defendant argues that, in fact, Kinsella was terminated pursuant to a legitimate RIF.

Kinsella, in reply, does not contend that the RIF itself was unwarranted. There is little reason to doubt that the RIF was a legitimate response to the inefficiencies of the print facilities at Griffiss and Rome. Rather, Kinsella argues that the RIF provided Peterson with a convenient opportunity to fire the "blind person" from the defendant's facilities altogether without raising the specter of discrimination.

According to Voisine's deposition testimony, Peterson explicitly stated prior to the RIF that "the new organization was not going to be able to run with" Kinsella because Peterson "just did not believe that a blind person could run copiers and do print work." And of the eight people terminated in the RIF, only Kinsella was not rehired by either DPS, DFAS's new print shop, which was also under Peterson's supervision, or otherwise by DFAS, whose management Peterson had contacted about rehiring those terminated in the course of the RIF. Boudreau, whom Kinsella had trained, was tapped for the temporary job at DFAS's new print shop despite the fact that she was junior to Kinsella. These circumstances, viewed in their entirety, would permit a reasonable finder of fact to conclude that Peterson used the legitimate RIF as an opportunity to terminate Kinsella because of his disability.

### II.  Failure to Promote

■■■ To establish a prima facie case of discriminatory failure to promote, a plaintiff must "allege that she or he applied for a specific position or positions and was rejected therefrom, rather than merely asserting that on several occasions she or he generally requested promotion." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir.1998). Kinsella does not allege and the record does not indicate that he ap-

plied for specific positions or that positions became available and were filled by others,[3] but merely that he repeatedly requested a promotion. Kinsella thus failed to establish a prima facie case that he was denied promotion because of his disability.

## CONCLUSION

For the foregoing reasons, the order of the district court is affirmed with respect to the failure to promote claim and vacated with respect to the unlawful termination claim, and the case is remanded for further proceedings consistent with this opinion.

---

3. The three Bindery Machine Operator positions, made available after the RIF and filled by DPS employees more senior to Kinsella, are not relied upon by Kinsella in his failure to promote claim.