**Ivy SILBERSTEIN, d/b/a Ivy Supersonic, Plaintiff,**

v.

**FOX ENTERTAINMENT GROUP, INC., Twentieth Century Fox Film Corporation; Blue Sky Studios, Inc.; John Does 1 through 10; Jakks Pacific, Inc.; Ubi Soft Entertainment, Inc.; Harpercollins Publishers, Inc.; and Xyz Corporations 1 through 1500, Defendants.**

**No. 02 Civ. 1131(RJH).**

United States District Court, S.D. New York.

July 19, 2004.

---

618

Peter S. Cane, New York City, for Plaintiff.

Eulas G. Boyd, Jr., Jacques M. Rimokh, Jonathan Zavin, Loeb & Loeb, L.L.P., New York City, for Defendants.

## *OPINION*

HOLWELL, District Judge.

This is an action asserting claims of copyright infringement under the Copyright Act, 17 U.S.C. § 501 et seq., and trademark infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and alternatively asserting state law claims for common law idea misappropriation, deceptive business practices, and false advertising, based on defendants' alleged unlawful copying of plaintiff's cartoon drawing of a purported squirrel-rat hybrid she calls "Sqrat." Defendants move for summary judgment as to all of plaintiff's claims. For the reasons set forth below, the motion is granted and plaintiff's complaint is dismissed in its entirety.

## BACKGROUND

Unless otherwise noted, the following facts are not in dispute.[1] Plaintiff Ivy

---

1. The facts are drawn from the following documents, and are cited as indicated herein: Defendants' Statement of Undisputed Facts Pursuant to Local Civil Rule 56.1 ("Defs.' 56.1 ¶ __"); Declaration of Jonathan Zavin in Support of Defendants' Motion for Summary Judgment ("Zavin Decl. ¶ __") and attached exhibits; Declaration of Chris Wedge in Support of Defendants' Motion for Summary Judgment ("Wedge Decl. ¶ __") and attached exhibits; Declaration of Peter de Sève in Support of Defendants' Motion for Summary Judgment ("de Sève Decl. ¶ __") and attached exhibits; Declaration of William H. Frake III in Support of Defendants' Motion for Summary Judgment ("Frake Decl. ¶ __") and at-

Silberstein ("Silberstein" or "plaintiff"), who also goes by the name of "Ivy Supersonic," is a self-styled promoter and publicist, as well as a designer of whimsical hats that have been worn by celebrities. (Silberstein Decl. ¶¶ 1—3.) In or around May 1999, Silberstein embarked on a new enterprise after having been inspired by the sight of an animal in a New York City park that appeared to be a cross between a squirrel and a rat. (Id. at ¶ 5.) Imagining that an animated version of such a creature had significant commercial potential (Id. at ¶ 6), she dubbed the as-yet purely notional character "Sqrat." Silberstein was not the first person to develop the concept of a squirrel-rat hybrid, or to use the word "sqrat," a composite of the words "squirrel" and "rat," to signify such a creature. (Zavin Reply Decl. Ex. N.) However, Silberstein appears to have been the first to take steps to secure legal protection for the name by filing an application with the U.S. Patent and Trademark Office ("PTO") for a word mark registration for "Sqrat" (Id. at ¶ 8; Zavin Decl. Ex. I). The "Sqrat" word mark was published for opposition by the PTO in December 1999, and received no opposition before the PTO deemed the mark abandoned in March 2001.[2] (Silberstein Decl. ¶ 9; Zavin Decl. Ex. L.) During the period of Sqrat's development in mid–1999, Silberstein, through an intermediary, commissioned an artist to create a prototype cartoon drawing of Sqrat that contained the word "SQRAT" and the World Wide Web address "www.sqrat.com" ("Sqrat logo"). (Silberstein Decl. ¶ 10, Zavin Decl. Ex. D at 43:14—21.) A copy of the Sqrat logo is appended to this opinion as Exhibit

tached exhibit; Declaration of Michael DeFeo in Support of Defendants' Motion for Summary Judgment ("DeFeo Decl. ¶ __") and attached exhibits; Declaration of John Dodelson in Support of Defendants' Motion for Summary Judgment ("Dodelson Decl. ¶ __") and attached exhibits; Declaration of Leslie Schor in Support of Defendants' Motion for Summary Judgment ("Schor Decl. ¶ __") and attached exhibits; Declaration of Athena Xenakis in Support of Defendants' Motion for Summary Judgment ("Xenakis Decl. ¶ __") and attached exhibits; Declaration of Rachel Tiep–Daniels in Support of Defendants' Motion for Summary Judgment ("Tiep–Danels Decl. ¶ __") and attached exhibits; Declaration of Jerry Davis in Support of Defendants' Motion for Summary Judgment ("Davis Decl. ¶ __") and attached exhibit; Declaration of Maria Criscuolo in Support of Defendants' Motion for Summary Judgment ("Criscuolo Decl. ¶ __") and attached exhibit; Declaration of Bonnie I. Bogin in Support of Defendants' Motion for Summary Judgment ("Bogin Decl. ¶ __") and attached exhibit; Declaration of Meredith Lipsky in Support of Defendants' Motion for Summary Judgment ("Lipsky Decl. ¶ __"); Reply Declaration of Jonathan Zavin in Further Support of Defendants' Motion for Summary Judgment ("Zavin Reply Decl. ¶ __") and attached exhibits; Reply Declaration of Chris Wedge in Further Support of Defendants' Motion for Summary Judgment ("Wedge Reply Decl. ¶ __") and attached exhibits; Declaration of Jack D. Samuels ("Samuels Decl. ¶ __"); Declaration of Christopher Meledandri in Support of Defendants' Motion for Summary Judgment ("Meledandri Decl. ¶ __"); Declaration of Michael Berg in Support of Defendants' Motion for Summary Judgment ("Berg Decl. ¶ __") and attached exhibit; Declaration of Michael Madnick in Support of Defendants' Motion for Summary Judgment ("Madnick Decl. ¶ __"); Plaintiff's Statement Pursuant to Local Rule 56.1 ("Pl.'s 56.1 ¶ __"); Declaration of Peter S. Cane in Opposition to Defendants' Motion for Summary Judgment ("Cane Decl. ¶ __") and attached exhibits; Declaration of Ivy Silberstein in Opposition to Defendants' Motion for Summary Judgment ("Silberstein Decl. ¶ __") and attached exhibits; Declaration of Randall White ("White Decl. ¶ __"); Declaration of Mort Gerberg ("Gerberg Decl. ¶ __"); and Plaintiff's Fact Witness Declarations.

2. After this litigation was commenced, Silberstein, through her attorney, attempted to revive her trademark application, but her petition was denied on December 6, 2002. (Silbertstein Decl. ¶ 9 n. 1; Zavin Reply Decl., Ex. P.)

A. Silberstein took some further steps to generate interest in her Sqrat, including attending a trade show for buyers and sellers of new animated characters (Silberstein Decl. ¶¶ 11–12), and distributing a single-page "media alert" that included, *inter alia,* a drawing of a creature different from the Sqrat logo and the query, "What is Mayor Giuliani doing about the infiltration of SQRAT in New York City ? ? ?" (Zavin Reply Decl. Ex. J, 118:9—121:13; Ex. Q). The Sqrat logo later graced promotional items produced and distributed by Silberstein, including T-shirts, stickers, and a banner that hung, at various times, at the back of the stage of an outdoor rock concert attended by several thousand people in Wantagh, New York in or around June 1999; at a June 1999 promotional party in Manhattan attended by entertainment industry executives; at a comic, art and toy expo in New York City held in November 1999; and at a film festival in New York City in February 2000. (Silberstein Decl. ¶¶ 17—20, 60, 66.) Silberstein cites several other events at which she promoted her "Sqrat," and numerous individuals to whom she "pitched" the Sqrat character; the record shows that Silberstein's promotional efforts generated some attention from the media, including mentions in various magazines and a recurring segment on CNN that was also broadcast during Continental Airlines' in-flight programming. (Silberstein Decl. ¶¶ 28—30, 34—36, 78—83.) Further, Silberstein and an associate collaborated on a proposed script for an animated series featuring Sqrat that was submitted to and accepted as an official entry in the New York International Film and Video Festival. (Silberstein Decl. Ex. E.) Silberstein also created one or more websites devoted to Sqrat, although there is conflicting evidence as to when the site or sites actually became operational. (Silberstein Decl. ¶ 10; Zavin Reply Decl. Exs. F, G, H.)

During the period in which Silberstein began to promote her Sqrat, Twentieth Century Fox Film Corporation ("Fox") was in the early stages of production on an animated feature film called *Ice Age.* (Defs.' 56.1 ¶¶ 1—3.) Blue Sky Studios, Inc. ("Blue Sky"), an animation company, was engaged to create the animation for the film. (*Id.* at ¶ 2.) The film's creators strove to portray the historical period in which the film's events took place—the onset of the Ice Age—with some historical accuracy (as evidenced by visits by members of Blue Sky's creative team to the Museum of Natural History and the Bronx Zoo, and reviewing books and magazines containing pictures of prehistoric animals, Defs.' 56.1 ¶ 5). Although the three main characters in the film were based on animals that had actually existed during the Ice Age, one character prominently featured in the film was based on a prehistoric creature, the *leptictidium,* that predated the Ice Age by several million years. (White Decl. ¶¶ 5, 24.) This character was known as "Scrat," a rodential being with bulging eyes, a long snout, saber teeth, a raccoon-like striped tail, and an anxious mien. His was a modest part, serving as a plot device and comic relief; but his hilarious antics in the theater release of the film received greater exposure in the home DVD release of *Ice Age,* which contained a short film called "Scrat's Missing Adventure." (Wedge Decl. Ex. 5.) An image of Scrat from *Ice Age* is appended to this opinion as Exhibit B.

Silberstein initiated this lawsuit upon learning of the film *Ice Age* and the Scrat character, which she alleges was a knock-off of her own Sqrat. The Corrected Third Amended Complaint alleges violations of the federal Copyright Act, 17 U.S.C. § 101 *et seq.;* of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); §§ 349 and 350 of the New York General Business

Law; and the New York common-law proscription of idea misappropriation. The defendants in her action include the creators and producers of the film, as well as Jakks Pacific, Inc., who allegedly manufactured and sold "Scrat" toys; Ubi Soft Entertainment, Inc., who allegedly created a video game featuring Scrat; and Harper-Collins Publishers, Inc., who allegedly published a novel based on *Ice Age*. (Zavin Reply Decl. Ex. D, ¶ 34.) Silberstein moved for a preliminary injunction in February 2002, seeking to enjoin defendants from distributing, exhibiting, displaying, performing or copying those portions of *Ice Age* which featured or referred to Scrat, and from manufacturing, marketing, distributing, selling or licensing any products or merchandise featuring or referring to Scrat. However, Silberstein's preliminary injunction motion was withdrawn soon thereafter, evidently at the insistence of defendants' counsel, who informed Silberstein's lawyers that they had just learned that her Sqrat was "copied virtually in its entirety from an image created, owned and published by . . . a company in the business of creating and distributing 'clip art' drawings." (Cane Decl. Ex. A.) Defendants asserted that, as a consequence, Silberstein had "no rights in the underlying image which she calls 'Sqrat' and cannot sue for copyright infringement based on that image." (*Id.*)

Indeed, Silberstein's Sqrat was virtually a dead ringer for "Beaver Cartoon # 2," ("the Beaver"), a copyrighted image then available on a CD–ROM and in a book both created by Smart Designs, a company in Tempe, Arizona. (*Id.*; Zavin Decl. Ex. A, 78:18—24.) A copy of the Beaver is appended to this opinion as Exhibit C. The Beaver was altered by the artist hired by Silberstein to create the Sqrat logo in a few respects: the beaver's tail was replaced with a tail that the artist intended to be a squirrel's tail (Zavin Decl. Ex. A, 82:24—83:2); the ears were made rounder; whiskers were added; the artist allegedly "played with the teeth a little" (*Id.* at 81:20) (though the buckteeth of the Beaver and those of Sqrat logo are not discernibly different); and Sqrat holds a sign reading "SQRAT."

Silberstein undisputedly did not know and was not told by her artist that his rendering of Sqrat was based on a clip-art drawing until after the fact was uncovered by counsel for defendants. (Cane Decl. Ex. B, 188:8—23; Silberstein Decl. ¶ 92.) After the derivative nature of Sqrat came to light, however, the need to nail down the intellectual property rights at stake in the Sqrat/Scrat skirmish engendered a flurry of activity on both sides of this dispute. In or around March 2002, Fox entered into a written agreement with Digital Art Solutions, Inc. ("DAS"), the successor in interest to Smart Designs, which warranted that it was the sole owner of the copyright in and to the Beaver and transferred and assigned its rights, title and interest in and to the Beaver to Fox, retroactive to the date of the Beaver's creation. (Cane Decl. Ex. C.) [3] It was soon revealed, however, that DAS might have transferred more rights than it had, since the Beaver, once thought to have been created as a work-for-hire by an employee of Smart Designs, was actually drawn by an artist named Ron Szafarczyk, an independent contractor. (*Id.*, Ex. D at 50:6—14, 108:14—22.) The ensuing dispute between

---

**3.** Plaintiff submits declarations from the artist who created Sqrat from the Beaver, Peter Levine, and Levine's former business partner, Alan Zaslau, alleging that representatives for Fox improperly offered them money if they would deny that Silberstein owned the rights to Sqrat and sell Fox their rights. Both Levine and Zaslau allegedly rejected the offer. (Fact Witness Declarations, Exs. 11 & 20.)

DAS and Szafarczyk went to arbitration, and after a hearing on the issue, on July 1, 2003, the arbitrator awarded an undivided one-half ownership of the Beaver copyright to each party, effective July 27, 1999. (Cane Decl. Ex. E; Bogin Decl. Ex. A.) The final award, which by its terms legally bound the assignees of both parties (Cane Decl. Ex. E), was confirmed by an Arizona Superior Court judge (Zavin Decl. Ex. C). Subsequently, in or around July 2003, Silberstein purchased Szafarczyk's rights in and to the Beaver, retroactive to the date of the Beaver's creation in July 1994. (Silberstein Decl. Ex. K.) Further, in or around September 2003, Fox and DAS entered into a second agreement that superseded and voided the March 2002 agreement based on the fact that the parties had, at the time of that prior agreement, lacked knowledge as to the ownership of the Beaver copyright. Under the new agreement, Fox gained a non-exclusive license, retroactive to July 27, 1994 and continuing in perpetuity, to use and exploit the Beaver in connection with Fox's Scrat. (Bogin Decl. Ex. A.) The new agreement also contains a release from liability for any future use Fox might make of the Beaver. (*Id.*)

In spite of this scramble to assert ownership of the Beaver copyright, defendants are not contending that they based their Scrat on the Beaver. Rather, they base their motion for summary judgment on five primary fronts. First, they argue that their license to use the Beaver cartoon operates to preclude a copyright infringement claim as to any features of plaintiff's Sqrat that were in the original Beaver cartoon.[4] Second, they claim that Silberstein has failed to present evidence that

the creators of the *Ice Age* Scrat ever had access to the Sqrat logo, as would be necessary for her to prove that copying had taken place. Third, they maintain that the evidence of independent creation of Scrat defeats any claim of actual copying of Sqrat. Fourth, they contend that Scrat is not substantially similar to the protectible elements of the Sqrat logo. Fifth, they argue that the evidence does not support a claim of trademark infringement because (1) Silberstein has not used the word "Sqrat" or the Sqrat logo in commerce; (2) "Sqrat" is a descriptive term, thus necessitating a showing that the term had secondary meaning, and Silberstein has failed to put in evidence of secondary meaning; and (3) the evidence cannot support a claim of likelihood of confusion. Defendants also contend that the evidence cannot support plaintiff's state law claims.

## DISCUSSION

### I. Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). In reviewing the record, the district court must assess the evidence in "a light most favorable to the nonmoving party" and resolve all ambiguities and "draw all reasonable inferences" in its favor. *LaBounty v. Coughlin,* 137 F.3d 68, 73 (2d Cir.1998); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

---

**4.** While the record does not contain a copyright registration for Sqrat, reference to such a registration is contained in defendants' papers (Zavin Decl. Ex. D, 258:17—19), and no

issue of the validity of the Sqrat copyright is raised in defendants' motion, so validity will be assumed for the purposes of this opinion.

An alleged factual dispute between the parties will not by itself defeat a motion for summary judgment, since "the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247—48, 106 S.Ct. 2505 (emphasis in original). In order to defeat such a motion, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Id.* at 256, 106 S.Ct. 2505; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322—23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A fact issue is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Mack v. Otis Elevator Co.,* 326 F.3d 116, 120 (2d Cir.2003) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under governing law.'" *Kinsella v. Rumsfeld,* 320 F.3d 309, 311 (2d Cir.2003) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

## II. Federal Intellectual Property Claims

While graphic representations of characters such as Sqrat are often protected both by copyright law and by trademark law, *see Museum Boutique Intercontinental, Ltd. v. Picasso,* 880 F.Supp. 153, 167 (S.D.N.Y.1995), the purpose and scope of the respective bodies of law are distinct. I shall discuss each claim in turn.

### A. Copyright Claim Regarding the Sqrat Logo

▮ In order to prove copyright infringement, the owner of a valid copyright is required to show both that the defendant actually copied her work, and that the copying amounts to an improper or unlawful appropriation of the owner's protectible material. *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 139—40 (2d Cir.1992). The first element, actual copying, "may be established either by direct evidence of copying or by indirect evidence, including access to the copyrighted work, similarities that are probative of copying between the works, and expert testimony." *Id.* at 140. If actual copying is shown, "plaintiff must then show that the copying amounts to an improper appropriation by demonstrating that substantial similarity to protected material exists" between the protected material in plaintiff's work and the defendant's allegedly infringing work. *Id.See also Tufenkian Import/Export Ventures, Inc. v. Einstein Moomjy, Inc.,* 338 F.3d 127, 131 (2d Cir.2003); *Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,* 150 F.3d 132, 137—38 (2d Cir.1998).

### 1. Actual Copying of the Sqrat Logo

▮ In order to withstand defendants' motion as to her copyright claim, plaintiff must submit evidence creating a genuine issue of material fact as to whether defendants actually copied Sqrat. Since direct proof of such copying is seldom available, courts have recognized that a plaintiff may satisfy her burden via circumstantial evidence, by showing that defendants had access to the allegedly infringed work, and that there are similarities between the works that are probative of copying. *Jorgensen v. Epic/Sony Records,* 351 F.3d 46, 51 (2d Cir.2003) (citing cases). Expert testimony may be offered in support of a claim of actual copying. *Laureyssens,* 964 F.2d at 140.

▮ *Access.* "Access" means that the alleged infringer had a reasonable opportunity to observe or copy plaintiff's work. *Tisi v. Patrick,* 97 F.Supp.2d 539, 547 (S.D.N.Y.2000). "In order to support a claim of access, a plaintiff must offer significant, affirmative and probative evidence." *Jorgensen,* 351 F.3d at 51 (citation and internal punctuation omitted). Plaintiff's showing of access is exceeding-

ly weak. The primary foundation for this aspect of her case is her active "pitching" of Sqrat to employees and agents of Fox Family Worldwide, Inc. ("FFW"). Silberstein asserts that a relationship exists between FFW and Fox Family Films, and implies that FFW owns or controls Fox Family Films. (Cane Decl. ¶ 44.) It is undisputed that Fox Family Films was the name of the wholly owned subsidiary of Fox that produced *Ice Age* at the time development of the film began, and that the corporate name changed to its current name, Twentieth Century Fox Animation, at some point during the course of development. (Meledandri Decl. ¶ 3—4.) The only evidence Silberstein produces of a relationship between the two corporate entities, however, is a Form 10–K for the fiscal year ended June 30, 2000, which states that FFW is "owned 49.5% by the Company [defined as Fox Entertainment Group, Inc. (together with its direct and indirect subsidiaries, and their respective predecessors ...)] and 49.5% by Haim Saban and certain limited partnerships controlled by Mr. Saban." (Zavin Reply Decl. Ex. R.) This is not probative of a corporate relationship between FFW and Fox Family Films giving rise to an inference of access. On the contrary, defendants have submitted uncontroverted evidence that, the similarity between the corporate names notwithstanding, FFW does not control or own Fox Family Films, the two corporations do not have any employees in common, their offices have never been located in the same building, and neither FFW nor any of its subsidiaries "had any involvement whatsoever in the creation, development or production of 'Ice Age' or any of the characters in 'Ice Age.' " (*Id.* at ¶¶ 5—7.) Defendants have submitted testimony stating that "[t]he only corporate relationship between [Fox Family Films and FFW] was that Twentieth Century Fox Film Corporation (of which Fox Family Films was a division from 1996 to 1998 [at which point its name became Twentieth Century Fox Animation]) was a corporate affiliate of the subsidiary of Fox Broadcasting Company which was one of the joint venture partners in [FFW]," (*Id.* at ¶ 7), and that "neither Fox Broadcasting Company nor any [of] its subsidiaries had any involvement in the creation, development or production of 'Ice Age' " (*Id.*). In light of the apparent lack of nexus between alleged recipients of Sqrat materials and creators of *Ice Age*, given the highly attenuated corporate relationship between FFW and Fox Family Films, and the geographical as well as divisional separations between the two entities, FFW employees' exposure to Sqrat did not create a reasonable possibility that the alleged infringers had a reasonable possibility of seeing Sqrat, and therefore plaintiff's submission of materials to or direct solicitation of FFW employees or representatives cannot create an inference of access. *See Jorgensen,* 351 F.3d at 48 (no triable issue of access when no evidence of nexus between recipients of the protected work and alleged infringers).

In further support of her allegations of access, Silberstein also contends that she directly approached Meredith Lipsky, Director of Field Publicity and Promotions for Twentieth Century Fox (the film division of Fox) at a film premiere party, and spoke to Lipsky about Sqrat. (Lipsky Decl. ¶ 1; Silberstein Decl. ¶¶ 57—58.) Silberstein claims that she showed Lipsky a magazine article about Sqrat, and that Lipsky indicated that she was familiar with Sqrat. (Silberstein Decl. ¶ 58.)[5] While

5. Silberstein's declaration diverges from her earlier account of this meeting with Lipsky,

Lipsky admits having attended the premiere party, she denies ever having received or seen any materials relating to Sqrat; says she never passed on any information about Sqrat to anyone at Fox Entertainment Group, Inc., Fox, or Blue Sky; claims to recall neither discussing Sqrat with Silberstein nor even meeting Silberstein; and states that prior to the instant lawsuit, she had never even heard of a character called Sqrat. (Lipsky Decl. ¶¶ 3—5, 8.) Lipsky further declared that her job involves publicizing a movie only after it has been completed, and does not involve listening to or soliciting pitches, or communicating pitched ideas to others at Fox. (*Id.* at ¶¶ 6—7.)

Looking at the evidence in the light most favorable to plaintiff, it can be inferred that Lipsky spoke to Silberstein and perhaps even received promotional materials about Sqrat. Such an interaction would constitute "bare corporate receipt" of plaintiff's work by an individual with no alleged connection with anyone involved in the creation of the *Ice Age* Scrat, which is insufficient to show access. *Jorgensen,* 351 F.3d at 53 ("Bare corporate receipt ..., without any allegation of a nexus between the recipients and the alleged infringers, is insufficient to raise a triable issue of access.")

■ Silberstein further supports her access argument by enumerating the entertainment industry professionals to whom she pitched Sqrat (Silberstein Decl. ¶ 30), and the media mentions of Sqrat, some of which were made even "before the 'Sqrat' was created" (*Id.* at ¶¶ 54—55, 78—83). Silberstein does not offer evidence that anyone in the industry to whom she pitched Sqrat ever communicated about Sqrat to anyone involved in the creation of *Ice Age,* does not produce evidence that anyone involved in *Ice Age* ever saw or heard about any media mentions of Sqrat, and does not provide any other indication of a nexus between receivers of information about Sqrat and the *Ice Age* creators. Plaintiff places a great deal of emphasis on a mention of Sqrat in a late September-early October issue of *License* magazine, which is apparently a trade publication for the licensed characters industry. (*Id.* at ¶¶ 53—55.) Plaintiff presents evidence to support her allegation that the magazine was sent to several officers and employees of various subsidiaries of Fox Entertainment Group. (*Id.* at ¶ 56.) However, there is no evidence that anyone at Fox or Blue Sky ever received or saw the issue of *License* before this litigation, and employees of Blue Sky and Fox involved in the creation of the *Ice Age* Scrat uniformly deny having seen the issue in question. (Bogin Decl. ¶¶ 2—4; Wedge Decl. ¶ 31; DeFeo Decl. ¶ 36; Frake Decl. ¶ 14; de Sève Decl. ¶ 14.) The bare possibility that a defendant may have seen a plaintiff's copyrighted material through some public

contained in two affidavits previously submitted in this litigation, in which her interaction with Lipsky is limited to discuss[ing][her] 'Sqrat' merchandising efforts with Lipsky. (Zavin Reply Decl., Ex. D, ¶ 17; Ex. E, ¶ 42.) It is well settled that a party may not create an issue of fact to defeat summary judgment by submitting an affidavit that contradicts prior sworn testimony in the case. *See Trans-Orient Marine v. Star Trading & Marine, Inc.,* 925 F.2d 566, 572 (2d Cir.1991) ("[A] party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony."); *Gemmy Indus. Corp. v. Chrisha Creations Ltd.,* No. 04 Civ. 1074, 2004 WL 1406075, *12 (S.D.N.Y. June 23, 2004) (holding that statement in party's affidavit contradicting his earlier sworn statements failed to create a genuine issue of material fact). In this case, a triable issue of access could not be created by Silberstein's account of her interaction with Lipsky in the Silberstein Declaration to the extent that that account is discrepant with her previous description of the incident.

medium is not sufficient to create a genuine issue of material fact as to access. *See Novak v. Nat'l Broad. Co.*, 752 F.Supp. 164, 170 (S.D.N.Y.1990) (broadcast of plaintiff's skit four times on television was not sufficient to create issue of fact as to defendant's access to plaintiff's work). What is more, any media mentions of Sqrat made before the Sqrat logo was actually created, even if seen by a creator of *Ice Age*, are not relevant to plaintiff's copyright infringement claim: "[O]ne of the first rudiments of intellectual property is that no one may copyright an idea," *Conan Properties, Inc. v. Mattel, Inc.*, 712 F.Supp. 353, 358 (S.D.N.Y.1989), so there could be no copyright infringement where no copyright interest could yet have existed.

■ Silberstein has contended that her Sqrat was widely disseminated in the media, and argues that this widespread dissemination should allow an inference of access. This court has consistently recognized widespread dissemination giving rise to an inference of access exclusively in cases where the allegedly infringed work has had considerable commercial success or is readily available on the market. *See ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988 (2d Cir.1983) (access inferred where song was number one on the popular music charts for weeks in the United States and England); *Arnstein v. Porter*, 154 F.2d 464, 469 (2d Cir.1946) (finding access inferable where "more than a million copies of one of [plaintiff's] compositions were sold; copies of others were sold in smaller quantities or distributed to radio stations or band leaders or publishers, or the pieces were publicly performed"); *Acuff–Rose Music, Inc. v. Jostens, Inc.*, 988 F.Supp. 289, 293 (S.D.N.Y. 1997) (drawing inference of access based on widespread dissemination, where allegedly infringed song was a top-five country

hit at time of alleged infringement); *Repp v. Webber*, 947 F.Supp. 105, 115 (S.D.N.Y. 1996) (no finding of widespread dissemination when "greatest commercial success" of musical containing allegedly infringed song occurred two years after creation of allegedly infringing work); *Iris Arc v. S.S. Sarna, Inc.*, 621 F.Supp. 916, 918 (S.D.N.Y.1985) (widespread dissemination found where plaintiff marketed its products nationwide, advertised them in an annual catalogue and in trade magazines, exhibited them at frequent trade shows, and had them on permanent display in showrooms in sixteen cities); *Well–Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, 210 F.Supp.2d 147, 165—66 (E.D.N.Y.2002) (defendant's principal decided to design and market product only after learning that plaintiff's similar product was "selling well in the United States"). Plaintiff provides no such evidence of commercial success here; no inference of access may therefore be drawn from media coverage absent any signs that Sqrat was, even for a moment, popular or widely available for public consumption.

■ Ultimately, plaintiff's claim of access is based upon speculation and conjecture, not on evidence showing a reasonable possibility that the creators of *Ice Age* ever had access to Sqrat. Conjecture cannot create a genuine issue of material fact as to access. *Jorgensen*, 351 F.3d at 51; *Gaste v. Kaiserman*, 863 F.2d 1061, 1066 (2d Cir.1988).

***Probative Similarity.*** Assuming plaintiff's evidence had created a triable issue as to access, plaintiff would also have to show similarities probative of copying in order to prove actual copying. *Procter & Gamble Co. v. Colgate–Palmolive Co.*, 199 F.3d 74, 77 (2d Cir.1999); *Repp v. Webber*, 132 F.3d 882, 889 (2d Cir.1997), *cert. denied*, 525 U.S. 815, 119 S.Ct. 52, 142 L.Ed.2d 40 (1998). Plaintiffs offer the dec-

laration of an expert, Mort Gerberg, a cartoonist, who states emphatically that his comparison of the two works leads him to the inescapable conclusion that the defendants copied from Silberstein's Sqrat. (Gerberg Decl. ¶¶ 9—29.) While the credibility of Gerberg's affidavit is perhaps questionable,[6] in reviewing the evidence in the light most favorable to plaintiff, the court will conclude for the purposes of this motion that Gerberg's affidavit creates a genuine issue of material fact as to whether probative similarities exist between Sqrat and Scrat. *Laureyssens,* 964 F.2d at 140.

**■ *Independent Creation.*** Even where a plaintiff is successful in creating a triable issue of fact with respect to actual copying, a defendant may defeat a copyright infringement claim by demonstrating independent creation of the allegedly infringing work. Evidence of independent creation is an established ground for granting summary judgment. *See, e.g., Cox v. Abrams,* No. 93 Civ. 6899, 1997 WL 251532, *7 (S.D.N.Y. May 14, 1997) (granting summary judgment based on uncontroverted evidence of independent creation) (citing *Novak,* 752 F.Supp. at 170). Here, defendants have produced copious undisputed testimonial and documentary evidence that the *Ice Age* Scrat evolved organically out of the research and creative and narrative developmental work performed by the film's creators. In particular, defendants submit evidence that the *Ice Age* Scrat was originally based on a prehistoric rodent called a *leptictidium,* which the character designer for the film learned about while researching potential supporting characters (Wedge Decl. ¶ 21; de Sève Decl. ¶¶ 6—8); that the designer

added various elements to the original *leptictidium*-like creature, including a striped, bushy tail, saber teeth, a longer nose, and large, protruding eyes, to make the character funnier and more interesting (de Sève Decl. ¶ 8—9; Wedge Decl. ¶ 21); that the Scrat was only one of several whimsical creatures designed during the creation of *Ice Age* that combined features of different kinds of animals (de Sève Decl. ¶ 6 & Ex. B); that work began on the *Ice Age* Scrat during the summer of 1999 and the character had attained its basic identity, subject to minor subsequent modifications, by late September 1999 (de Sève Decl. ¶ 11; DeFeo Decl. ¶¶ 10, 16); that a clay sculpture, based on drawings of the character that would in turn serve as a model for three-dimensional computer renderings of the character, was created by a Blue Sky employee in October 1999 (Dodelson Decl. ¶¶ 3—6; Wedge Decl. ¶ 22; DeFeo Decl. ¶¶ 14—16 & Ex. B); that the character was not known as "Scrat" *ab initio,* but was so dubbed during the creative process by a Blue Sky employee who thought it looked like a cross between a squirrel and a rat (Dodelson Decl. ¶ 5; DeFeo Decl. ¶ 30; de Sève Decl. ¶ 10); and that the name took various spellings, including "Sqrat," "Squrat," "Skrat," "Squrrat," and "Scrat," before its official spelling of "Scrat" was established (Dodelson Decl. ¶ 5 & Ex. B; DeFeo Decl. ¶¶ 31—32; Wedge Decl. ¶ 28). While it is theoretically not impossible that an individual involved with *Ice Age* was exposed to Silberstein's Sqrat logo prior to the creation of Scrat, the uncontradicted evidence demonstrates that the conception of this character and its role in the film

---

**6.** A layperson's review of Sqrat and Scrat does not point to obvious copying. Compare Exhibit A to Exhibit B. Moreover, the court notes that Gerberg does not opine as to whether there is copying of the elements in

Silberstein's Sqrat that were derived entirely from the Beaver cartoon or the few additional elements added to the Beaver cartoon by Silberstein's artist. Compare Exhibits A and C to Exhibit B.

evolved and developed in an incremental fashion that does not bear any indicia of having been shaped by plaintiff's Sqrat or indeed by any other preexisting creative work. (DeFeo Decl. Ex. A; Wedge Decl. ¶¶ 21—26; de Sève Decl. ¶¶ 7—13 & Ex. E; Frake Decl. ¶¶ 10—12; Dodelson Decl. ¶¶ 6—7 & Exs. A, B, D & F.) Such evidence is sufficient to show independent creation. *Scholastic Inc. v. Speirs*, 28 F.Supp.2d 862, 869 (S.D.N.Y.1998) (independent creation "unambiguously demonstrated" by "paper trail of contemporaneous memos and sketches ... relating to the development of the allegedly infringing work").

### 2. Unlawful Appropriation

 *Protectible Elements of the Sqrat Logo.* Sqrat is undisputedly derived from the Beaver. Compare Exhibit A to Exhibit C. Both plaintiff and defendant Fox have the right to use the Beaver, owing to (1) the confirmation of the arbitration award determining that Szafarczyk and DAS each held an undivided one-half copyright interest in the Beaver;[7] (2) the subsequent retroactive transfer of Szafarczyk's copyright interest to Silberstein; and (3) the subsequent retroactive license granted to Fox by DAS. There can be no copyright infringement action by a holder of a copyright against a licensee of another holder of the same copyright. *Country Road Music, Inc. v. MP3.com, Inc.*, 279 F.Supp.2d 325, 329—30 (S.D.N.Y.2003) (quoting *McKay v. Columbia Broad. Sys., Inc.*, 324 F.2d 762, 763 (2d Cir.1963)). The retroactivity of the licensing agreement between DAS and Fox has no necessary effect on its power to immunize Fox against claims of infringement of the Beaver copyright. *See Lone Wolf McQuade Assocs. v. CBS Inc.*, 961 F.Supp. 587, 597 (S.D.N.Y.1997) ("[A] retroactive license can cure past infringements."). By the same token, the retroactive conveyance of Szafarczyk's Beaver copyright to Silberstein is no impediment to her creation of Sqrat as a derivative work based on the Beaver. It is beyond cavil that the owner of a copyright may create a derivative work based on the underlying copyrighted work. 17 U.S.C. § 106(2); *Well–Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, 354 F.3d 112, 117 (2d Cir.2003).

Derivative works are entitled to copyright protection, but only to the extent of "material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and [copyright in the derivative work] does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b). *See also Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 348, 111 S.Ct. 1282, 1289, 113 L.Ed.2d 358 (1991) ("Originality remains the *sine qua non* of copyright; accordingly, copyright protection may extend

---

7. Defendant argues that the issue of ownership of the Beaver copyright was decided in a final judgment, therefore operating to collaterally estop re-litigation of this issue. Plaintiff urges the court to reject defendant's issue preclusion argument on the basis of *Postlewaite v. McGraw–Hill, Inc.*, in which the Second Circuit held that there could be no preclusive effect to a judgment if the issue in question was not actually decided in the prior proceeding. *Postlewaite v. McGraw–Hill, Inc.*, 333 F.3d 42, 48 (2d Cir.2003). In *Postlewaite,* however, the district court was asked to find preclusion as to an issue that had not been explicitly decided in a confirmed arbitration award, but may have been the unstated ground for the decision. The Second Circuit reversed the district court's finding of preclusion, holding that the issue was not actually decided because it was not clearly the only possible basis for the arbitrators' decision. *Postlewaite,* 333 F.3d at 49—50. In this case, the issue in question—the ownership of the Beaver copyright—was actually and expressly decided in the arbitration award and was confirmed by the Arizona Superior Court. Therefore, plaintiff is barred from re-litigating ownership of the Beaver copyright.

only to those components of a work that are original to the author."). Therefore, the only arguably protectible elements of the Sqrat logo for the purposes of this motion are those original elements that were contributed to the preexisting Beaver by Silberstein's artist.

■ The elements that have been contributed to the Beaver to create the Sqrat logo are the round ear, the bushy tail, whiskers, and a sign reading "SQRAT."[8] Copyright does not lend protection to all these elements. Names of cartoon characters, in particular, are not considered protectible. *See* 37 C.F.R. § 202.1 ("The following are examples of works not subject to copyright and applications for registration of such works cannot be entertained: . . . Words and short phrases such as names, titles, and slogans."). Trademark, not copyright, is the source of protection of character names. *See, e.g., Titan Sports, Inc. v. Hellwig*, No. 3:98–CV–467, 1999 WL 301695, *12 (D.Conn. April 26, 1999). Therefore, only the original physical characteristics of Sqrat, not the name "Sqrat," are copyrightable.

■ *Substantial Similarity*. Even were plaintiff able to create an issue of actual copying that could not be defeated by defendants' showing of independent creation, substantial similarities between the allegedly infringing work and the protectible elements of the plaintiff's work must be shown. "Although the question of substantial similarity is usually one of fact, it may, if warranted, be decided as a matter of law." *Conan*, 712 F.Supp. at 360. Plaintiff has not created a triable issue of fact as to substantial similarity. As an initial matter, the court notes that plaintiff's expert identifies several aspects of the *Ice Age* Scrat that allegedly bear similarities to Sqrat, including (1) disproportionately long snouts; (2) exaggerated long and jutting front teeth; (3) large, protruding eyes; (4) eyeballs with small, off-center pupils; (5) exaggeratedly large white areas of the eyes; (6) large, bulbous noses; (7) an anthropomorphic aura; (8) the name. (Gerberg Decl. ¶¶ 12—13.) However, none of these features is among the protectible elements of plaintiff's work, because all of them were present in the Beaver and were not perceptibly altered in creating the Sqrat logo. The Sqrat's protectible elements, as identified above, are its tail, its ear, its whiskers, and the sign it holds in its paw.

■ When evaluating the presence or absence of substantial similarity when the allegedly infringed work contains protectible and non-protectible elements, the court conducts a more discerning inquiry

---

8. Plaintiff claims that the Sqrat's teeth should be regarded as a protectible element of the Sqrat logo, as the artist who derived the Sqrat logo from the Beaver testified that he "played with the teeth a little." (Zavin Decl. Ex. A, 81:20.) However, even the most searching inspection yields no identifiable difference between the Sqrat's teeth and the Beaver's teeth. While the threshold for originality under copyright law is low, the Second Circuit has consistently held that "the only aspects of [derivative works] entitled to copyright protection are the non-trivial, original features, if any, contributed by the author or creator of these derivative works." *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 909 (2d Cir.1980). *See also Pannonia Farms, Inc. v. USA Cable*, No. 03 Civ. 7841, 2004 WL 1276842, *8 (S.D.N.Y. June 8, 2004) ("[A] copyright affords protection only for original works of authorship and, consequently, copyrights in derivative works secure protection only from the incremental additions of originality contributed by the authors of the derivative works."). If a derivative work contains a purported change that does not perceptibly alter the work on which it was based, that change cannot reasonably be regarded as non-trivial, creative, or original, and therefore may not be a protectible element of the derivative work.

than the "ordinary observer" test applied to a wholly original work. *See Boisson v. Banian, Ltd.*, 273 F.3d 262, 272 (2d Cir. 2001), and cases cited therein. This "discerning ordinary observer" inquiry entails not a piecemeal comparison of each of the protectible elements with its putative imitation, but rather a careful assessment of the "total concept and feel" of the works at issue, after the non-protectible elements have been eliminated from consideration. *Boisson*, 273 F.3d at 272; *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1003 (2d Cir.1995); *Hamil Am. Inc. v. GFI*, 193 F.3d 92, 101 (2d Cir.1999). Because the protectible elements of Sqrat are discrete features of its appearance that in isolation cannot effectively be evaluated without reference to their arrangement on the drawing as a whole, a fair comparison must refer to their placement within the entire drawing. *See Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109 (2d Cir.2001) (copyright protection extends to creative choices of selection and arrangement of elements within a work). A "total concept and feel" comparison of Sqrat with Scrat yields such fundamental differences between the two that no reasonable factfinder would be able to find in favor of plaintiff on the issue of substantial similarity.[9] Aside from the homophonic names, which is insufficient to show substantial similarity, *Hogan v. DC Comics*, 48 F.Supp.2d 298, 312 (S.D.N.Y.1999) (in granting summary judgment to defendants, finding that substantial similarity was not established by the fact that the central characters in both works were half-human-half-vampires named "Nicholas Gaunt"), there is virtually nothing similar about the two characters apart from their both being hybrid ro-

dents. First, Sqrat is a rather crudely drawn two-dimensional, monochromatic, static character, while Scrat is portrayed as existing and moving in three dimensions, and his fur, nose, eyes, mouth, and extremities are rendered in lifelike detail and realistic color and shade. (Silberstein Decl. Ex. B; Wedge Decl. Ex. 5.) Second, Sqrat is a heavy-set figure that stands upright like a human being, while Scrat's physique is characterized by long, lean lines and a hunched, conventionally rodent-like posture. Sqrat is a caricature with an assemblage of rudimentary comic-strip features, including a bushy tail, plump fore- and hind-paws, two exaggerated buckteeth, big oval googly eyes, a round, misshapen lump of a nose, a "V" over his eyes to suggest expressive eyebrows, whiskers, and what appears to be a navel. Scrat has a bushy tail with stripes like that of a raccoon; delicate, dexterous digits tipped with black claws; a mouthful of canine teeth and two long, tapered saber teeth; disproportionately large eyeballs with golden irises and tiny pupils; a large protruding nose with visible nostrils; no eyebrows; no whiskers; and no discernible navel. The only original element of Sqrat that resembles the Scrat in any meaningful way is its round ear, which on each character is perched atop its head, cresting behind the eyeball. A round ear on a rodent is hardly a novel feature, and under the doctrine of "scènes à faire," which excludes from copyright protection features of a work that are "indispensable, or at least standard, in the treatment of a given topic," *Hogan*, 48 F.Supp.2d at 309 (quoting *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 50 (2d Cir.1986)), there are limited possibilities in the placement of an ear on

9. Such a conclusion would be inescapable even under the less demanding "ordinary observer" test applied to wholly original works, *viz.*: "whether an average lay observer would overlook any dissimilarities between the works and would conclude that one was copied from the other." *Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.*, 166 F.3d 65, 70 (2d Cir.1999).

a rodent's head unless one ventures into the realms of surrealism or cubism. Substantial similarity cannot be established by this common feature. Because no reasonable jury could conclude that Sqrat and Scrat are substantially similar with respect to protectible (and, indeed, non-protectible) elements, summary judgment must be granted as to plaintiff's copyright infringement claim.

## B. Trademark Claim Regarding the Sqrat Logo

■ Plaintiff's trademark infringement claim is deficient as a matter of law. "To prevail on a claim of trademark infringement, a plaintiff must show, first, that its mark merits protection, and, second, that the defendant's use of a similar mark is likely to cause consumer confusion." *Brennan's, Inc. v. Brennan's Rest., L.L.C.,* 360 F.3d 125, 129—30 (2d Cir.2004). Both registered and unregistered trademarks may merit protection, but plaintiff proceeds only under § 43(a) of the Lanham Act, 15 U.S.C. § 1151(a), which creates a cause of action for infringement of unregistered trademarks.[10] Section 43(a) provides:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, [or] symbol, ... which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ... shall be liable in a civil action by any person who

believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). Section 43(a) requires that a use of a potentially confusing word, term, name or symbol be "in commerce" and "in connection with any goods or services" in order to be actionable as trademark infringement. Moreover, trademark doctrine dictates that not only the infringer, but also the infringed, must be using the mark in commerce. "The Supreme Court explained long ago that the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business." *Buti v. Perosa, S.R.L.,* 139 F.3d 98, 103 (2d Cir.1998)(citing *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 97, 39 S.Ct. 48, 50—51, 63 L.Ed. 141 (1918)). The right of trademark ownership "exists only as a right *appurtenant to an established business or trade* in connection with which the mark is employed." *Id.* (quoting *United Drug,* 248 U.S. at 97, 39 S.Ct. at 50) (emphasis in original). The contingency of this right is justified by the established purpose of § 43(a) of the Lanham Act, which, according to the Second Circuit, is "to prevent consumer confusion regarding a product's source ... and to enable those that fashion a product to differentiate it from others on the market." *EMI Catalogue Partnership v. Hill, Holliday, Connors, Cosmopulos Inc.,* 228 F.3d 56, 61 (2d Cir.2000)(quoting *Centaur Communications, Ltd. v. A/S/M Communica-*

---

**10.** Plaintiff filed a trademark registration for the word mark "SQRAT" in June 1999, which was deemed abandoned by the PTO in March 2001, evidently before advertising and marketing of *Ice Age* began; the film was released after this action was commenced in February 2002. As noted *supra,* plaintiff's refiled application was denied by the PTO. An action for infringement of a registered trademark therefore could not lie; see 15 U.S.C. § 1115(b).

*tions, Inc.,* 830 F.2d 1217, 1220 (2d Cir. 1987)) (ellipsis in original).

There can be no confusion as to the source of a product if there is no product. Silberstein distributed items emblazoned with the Sqrat logo, but her avowed purpose in doing so was to generate interest in Sqrat, not to differentiate or identify the origin of the goods, which were merely vehicles for the logo. She believed that Sqrat "had huge commercial potential for use in an animated film or television series," and her distribution of materials promoting Sqrat were "part of [her] campaign to license Sqrat as an animated movie star." (Silberstein Decl. ¶¶ 6, 21.) Silberstein characterizes her promotion of Sqrat as an "all-out advertising and marketing campaign." (*Id.* at ¶ 40.) "Mere advertising and promotion of a mark in this country are not enough to constitute 'use' of the mark 'in commerce,' so as to bring the activity within the scope of the Lanham Act." *Morningside Group Ltd. v. Morningside Capital Group, L.L.C.,* 182 F.3d 133, 138 (2d Cir.1999). See also *Cullman Ventures, Inc. v. Columbian Art Works, Inc.,* 717 F.Supp. 96, 113 (S.D.N.Y.1989) ("Mere advertisement of a product by use of a mark would not constitute common law trademark use[, since] [c]ommon law trademark rights develop when goods bearing the mark are placed in the market and followed by continuous commercial utilization.") (citations omitted). Silberstein's Sqrat logo was a mere advertisement for itself as a hypothetical commodity. Had she agreed to one of the offers she allegedly received in 2000 to license Sqrat for a TV project (Silberstein Decl. ¶¶ 85—90 & Exs. I & J), that commodity might have formed the basis for a trademark infringement action. No such basis exists here, and defendant's motion as to plaintiff's trademark infringement claim is granted.

### III. State Law Claims

Having granted defendants' summary judgment motion as to all plaintiff's federal claim, I decline to exercise jurisdiction over the pendent state law claims. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.").

### CONCLUSION

For the foregoing reasons, defendants' motion is hereby GRANTED in its entirety, and all claims are dismissed. The Clerk of the Court is directed to close this case.

SO ORDERED.